MINERS IN GENERAL GROUP, THOMAS EDW. MOORE *et al.*, etc., *Petitioners*, v. M. H. HIX, *Clerk*, etc., BOARD OF REVIEW OF THE DEPARTMENT OF UNEMPLOYMENT COMPENSATION *et al.*, *Respondents*.

(No. 9195)

Submitted September 4, 1941. Decided November 4, 1941.

*T. C. Townsend* and *Hillis Townsend,* for appellants.
*Charles L. Estep,* for appellees.

638

Fox, Judge:

This case comes to us on writ of certiorari to the Circuit Court of Kanawha County, and involves the right of the claimants to unemployment compensation benefits under the West Virginia Unemployment Compensation Act, Chapter 1, Acts of the Legislature, Second Extraordinary Session, 1936, and particularly the question of whether subsection 4, Section 4, Article 6 of said act, disqualifies the claimants from receiving benefits thereunder, it being contended that their unemployment was due to a labor dispute. The pertinent parts of Section 4 are here quoted:

"Upon the determination of the facts by the director or his deputy, an individual shall be disqualified for benefits:— * * * (4) For a week in which his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed, unless the director is satisfied that he was not (one) participating, financing, or interested in such dispute, and (two) did not belong to a grade or class of workers who were participating, financing, or directly interested in a labor dispute which resulted in a stoppage of work."

The question was first considered by the Director of Unemployment Compensation, next by the Trial Examiner, followed by an appeal to the Board of Review provided by statute, and finally upon appeal and certiorari by the Circuit Court of Kanawha County. In each instance benefits were denied to the claimants, and hence their application for a review by this Court.

The record shows that the claims here considered are some of many thousands filed by mine workers from all sections of the coal fields in this state, and our decision will, presumably, have the effect of determining the validity of all such claims, except in cases where they may differ substantially in character from those considered here. In the brief filed by counsel for claimants it is stated: "* * * we assume that if the decision of this

court should be favorable to the claimants on the broad question involving the interpretation of the Unemployment Compensation Law, the department would award benefits not only to those who prosecuted appeals, but to all those in the same class who originally filed claims for benefits." In oral argument counsel for claimants estimated the cost to the Unemployment Fund, in the event all such claims were paid, at seven to eight million dollars. Neither the assumption, nor the estimate of cost has been questioned. The statute quoted above applies to the individual worker, and, generally speaking, a "labor dispute" can only exist between the individual workers and their employer. However, the record discloses beyond question that the negotiations and disagreements arising therefrom, hereinafter to be considered, were carried on by mine workers through their representatives, the United Mine Workers of America, operating through its committee created for that purpose, on the one side; and by the various individuals, partnerships, and corporations operating the mines, through their committee created for the purpose, on the other. They will be hereinafter referred to as "mine workers" and "operators". No question of the right of these committees to represent the parties to the controversy is raised on the record, and we assume that no such question exists. The claimants are not shown to be within the excepted groups mentioned in the statute quoted above. The controversy in which these committees functioned covered the Appalachian and other coal fields. The claims considered by us, as indicated above, are those arising within this State, and originated in what is known as the Appalachian coal field, which covers all of this State, as well as adjacent and neighboring states, east and south of the Ohio River, where coal is mined.

It is a matter of public knowledge, of which we take judicial notice, and it also appears from statements in the record, that mine workers perform their labors under a contract with the operators in the Appalachian field and elsewhere, which contracts are entered into through conferences and negotiations between duly constituted com-

mittees representing the mine workers and the operators. Such a contract was entered into early in 1935, and under its provisions terminated on the 31st day of March, 1937. At or about the date of the termination of this agreement, a new contract was entered into which, under its terms, ended on the 31st day of March, 1939. In this latter contract it was provided that a meeting of the committees of the mine workers and the operators should be held in the City of New York on the 14th day of March, 1939, the purpose of this meeting being to negotiate and enter into a new contract to take the place of that expiring at the end of March of that year. That meeting was duly held, and proposals were made as to the terms of the new contract. The mine workers submitted numerous proposals, at one place in the record stated to be seventeen, as to what they desired incorporated in the new agreement. Just what those proposals were is not definitely shown by the record and is not important. On the other hand, the operators proposed to renew the contract which was to expire on the 31st day of March, 1939, for a further term of two years on the same terms as the expiring contract, except as to wages, and, as to wages, the proposal was that those in effect under the 1935 contract, which expired on March 31, 1937, should be adopted, and this, we understand, involved some wage reduction. The mine workers refused to accept this proposal of the operators, and the operators refused to accept the proposals made by the mine workers. On the 16th day of March, 1939, the mine workers made the following proposal:

"In order to allay any public apprehension concerning the liability of a suspension of the mining operations in the bituminous coal industry due to the expiration of the existing wage agreement, this Joint Conference

"Resolves that in the event no agreement is reached by March 31, 1939, that work in the industry shall be continued under the existing wages, conditions and contracts pending continuance of negotiations and ultimate success or failure to agree on a new contract."

This proposal was made in the form of a resolution offered by the representatives of the mine workers, and received their support, but was rejected by the operators. In connection with this proposal, it should here be said that, in itself, it implied at least a probability that work in the mines would cease in the event no agreement was reached by March 31, 1939, and was the mine workers' effort to avoid any cessation of work, and, as we understand, carried with it the further implication that if an agreement was reached, it would be made effective as of April 1st.

The work of the committees, termed "a joint conference," seems to have continued without success. There were no important developments until about the 28th or 29th day of March, when the operators proposed to enter into a new contract for a term of two years, beginning April 1, 1939, on the same terms as to wages and working conditions as those provided for in the contract which was to expire at the end of March. The mine workers refused to accept this proposition, and, it is claimed by the operators, made demand for the first time for a union shop, or a closed shop, or the abandonment of what is known as the penalty clause, which was incorporated in the contract then expiring. The evidence is somewhat confusing as to which of these propositions was particularly urged by the mine workers. As we understand it, what is known as a union shop is where the employer is permitted to employ a non-union worker, but such worker is required to join the union as a requisite to his continuing work; a closed shop is where the worker must be a member of the union as a condition precedent to his employment; and the penalty clause imposed a penalty upon either the mine workers or the operator, in case of an unauthorized strike or lockout during the continuation of the contract. From the standpoint of the mine workers, either of these propositions would have guarded their interests. Their principal purpose was to secure a contract under which only union men could work in the mines, and this would be accomplished either by the union shop agreement, or the closed shop agreement, and could be enforced, without penalty, by a strike or other process

during the continuance of the contract, if they elected to pursue that remedy. It seems that all of these propositions were made and considered, but, finally, as we understand the record, the mine workers settled down to a demand for a union shop, and on this rock the conference split, and remained divided until about the 13th of May, 1939, when an agreement was finally reached on the basis of the 1937 contract, with an added provision for the union shop. At a press conference in New York on April 12, 1939, at which Charles O'Neal, spokesman for the operators, and John L. Lewis, spokesman for the mine workers, were present, O'Neal stated: "The operators have offered to contract with the United Mine Workers under the same contract that has prevailed for two years."; to which Lewis replied: "And the mine workers have declined to accept that offer unless they are given the union shop"; whereupon O'Neal said, "And on that issue the men are idle."; Mr. Lewis replying: "And on that issue the men will continue to remain idle."

The mine workers remained out of the mines until about May 14, 1939, when, generally speaking, all of the mines were opened and all mine workers returned to work. Some operators declined to accept the agreement, and in a statement thereafter made, appearing in the official organ of the United Mine Workers of America, and attributed to John L. Lewis, its president, and not questioned, the following appears: "I want to issue a word of warning to associations in the six districts and to say to them that until they make up their minds to accept this agreement sound public policy requires that they keep those mines closed."

Work in the mines stopped at the end of March, 1939, and the stoppage continued until the contract above mentioned was signed, on or about May 13th. The mine workers were kept on the rolls of the various companies as employees, and in most, if not all instances, were extended credit at the company stores for necessary supplies, were carried for rent of houses, coal, and electricity, and such benefits as hospitalization, medical services and insurance were continued on the same basis as that ex-

isting when work was in progress. By agreement, maintenance men were permitted to work in the mines, in order to keep them in condition so that work could be promptly resumed when an agreement between the mine workers and the operators had been reached. The record discloses that when work, other than maintenance work, was suggested, union officials interposed objections, and no such work was permitted except possibly in one instance. It also discloses that the traditional policy of mine workers, and the organization which represented them, was not to work or permit work except under contract, and practically every miner who testified, stated that he would not work without a contract. So well understood was this traditional policy, that only in rare instances, mainly confined to what is known as wagon mines, was any attempt made to mine coal; and in some instances attempts made by such operators met with resistance on the part of those claiming to be union men. The operators of the larger mines made no attempt to open their mines in April, or to operate them during the progress of the conference in New York. We think it can be stated as a fact that neither the mine workers nor the operators expected any work to be done in the mines, except maintenance work, until an agreement had been reached and a new contract entered into, and that this understanding, on the part of each, existed from the 14th day of March until the final settlement was made. On the one hand the loyalty of the mine workers to their organization impelled them to refrain from work in the absence of a contract; while on the other hand knowledge on the part of the operators that they could not successfully operate their mines prompted them to forego any attempt to do so.

There is singularly little dispute as to the facts, but there is sharp conflict as to the reason for the stoppage of work. The mine workers say that they ceased work because of the failure of the joint conference in New York to reach an agreement, and that after April 1, 1939, they had no contract. The operators contend, in effect, that while stoppage of work may have been caused by failure to

reach an agreement, the reason for that failure was an underlying difference of opinion between them and the mine workers as to what the contract should contain, and that such difference of opinion constituted a labor dispute, and disqualified the claimants and others so situated from participation in the unemployment compensation fund. That is the sole question involved in this proceeding.

In the development of the law it has become increasingly necessary to use appropriate words to define what the law is on any subject. We say increasingly necessary, because of the wide use of statutory law to meet the changing needs of the times. It being necessary to so express thought, the rule has grown up, having universal application, that in all legislation it is supposed that the words used by legislative bodies are to be given their common, ordinary and accepted meaning. Sometimes the meaning of the words used in the statute are defined. Unfortunately, the words on which this controversy hinges, "labor dispute", are not defined in the Unemployment Compensation Act, and we must, therefore, endeavor to determine what the legislature meant when those words were used. The legislature being supposed to have used such words in their common and accepted meaning, it remains for us to determine what that meaning is. A dispute is defined in Webster's New International Dictionary as: "To contend in argument; to argue something maintained by another; to debate; often to argue irritably; wrangle * * *; to make a subject of disputation; to argue pro and con; to debate; * * * to oppose by argument or assertion; to attempt to overthrow; controvert; to call in question; to deny the truth, or validity of; * * *." In Federal legislation the term "labor dispute" has been defined in two acts of the Congress: In one act, relating to procedure for obtaining injunctions, generally known as the Norris-La Guardia Act, and enacted in 1932, U. S. C. A. Title 29, subsection "c" of Section 113, the term is defined as follows: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seek-

ing to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." In the National Labor Relations Act, U. S. C. A. Title 29, subsection 9 of Section 152, enacted in 1935, the term is defined: "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

Our Unemployment Compensation Act is based on the policy of social legislation enacted by the Congress of the United States and, as is well known, is operated in conformity with Federal legislation and to some extent under Federal restrictions. The underlying Social Security Act, U. S. C. A. Title 42, Section 1103, enacted in 1935, provides that:

"Compensation shall not be denied in such state to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (A) If the position offered is vacant due directly to a strike, lockout or other dispute; (B) if the wages, hours or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; (C) if as a condition of being employed the individual be required to join a company union or to resign from or refrain from joining any bona-fide labor organization".

Our own statute, Section 6, of Article 6, provides that:

"Notwithstanding any other provision of this chapter, no work shall be deemed suitable and benefits shall not be denied to an individual, otherwise eligible, for refusing to accept new work under any of the following conditions: (1) If the position offered is vacant due to a strike, lockout, or other dispute. (2) If the wages, hours, or other conditions of the work offered are substantially less favorable to the

> individual than those prevailing for similar work in the locality. (3) If as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona-fide labor organization."

We are not bound by the definition of a labor dispute contained in the Federal statutes, but these definitions are at least persuasive of what should be the definition of such a dispute, and are not out of line with the general and common acceptation of the meaning of the term. Until a better definition is found, or there is some substantial reason for a finding that our legislature had in mind a different meaning to be attached thereto, there would seem to be no impropriety in our accepting these existing definitions in the determination of what was then meant. So far as we know, the Federal statute, under which our own Unemployment Compensation Act to a certain extent operates, does not contain a definition of what a labor dispute is; but it does make provisions, which our statute closely follows, by which workers are protected against being deprived of compensation where strikes, lockouts and other labor disputes are in existence. At least the sections governing this situation in both Federal and State statutes are, in effect, similar, and bring out into bold relief the proposition that in enacting them, Congress and the legislature had in mind that there could be a labor dispute aside from either a strike or lockout.

We think we may go a step farther in endeavoring to ascertain what the legislature meant when it denied benefits to those whose unemployment was brought about as the result of a labor dispute. The legislature is presumed to have had knowledge of the existence in the past of serious controversies in this state between employers and employees, particularly in the business of mining bituminous coal. The assessments made to build up a fund to take care of benefits to which workers would be entitled, when unemployed, must be assumed to have been created on the idea of involuntary unemployment. Refusal to work is not, ordinarily, involuntary unemploy-

ment, although under our statute refusal to work under some conditions does not bar benefits. The burden upon the Unemployment Fund which would be entailed by the payment of compensation to those unemployed by reason of stoppage of work on account of failure to reach an agreement as to terms, wages and working conditions, could not, in the very nature of things, have been out of the mind of the legislature, and must have been considered when it incorporated in its enactment the provision that unemployment due to "a labor dispute" should not be a basis for unemployment benefits. The legislature using no words of explanation of its intent, we naturally resort to the generally accepted meaning of the term "labor dispute". Furthermore, our Unemployment Compensation Law, being enacted in consequence of, and to be administered in harmony with, pre-existing Federal legislation on the subject, we are warranted in resorting to general as well as special Federal enactments in interpreting the meaning of the term as used in our statute, which, in our opinion, plainly cover the difference of opinion between the mine workers and the operators in the joint conference held in New York.

The contention that there can not be a dispute in the absence of a contract is not, in our opinion, tenable. We think the record clearly shows that the mine workers, who were undoubtedly employees of the operators when the joint conference met in New York, continued such employment up to the end of their contract on March 31st, and treated and considered themselves as employees after that date until they resumed work on May 14th. There is nothing in the record indicating that the relation of employer and employee ever terminated. The employees expected to return to work when a contract had been signed, and the operators expected to open their mines and resume operations when such agreement was reached. There was no break in the relationship between them. This is best evidenced by the fact that, by consent of the mine workers, a substantial number were permitted and encouraged to work in the mines, in order to keep them in condition so that operations might be immediate-

ly resumed when a contract should be entered into; and that the operators treated them as their employees is attested by the undisputed fact that their credit at the company stores and other benefits and services were, in most instances, continued. It is reasonable to assume that such credit, benefits and services would only have been continued on the assumption that bills created thereby would be paid by work when operations in the mines should be resumed. As we view the matter, the operators, during the entire negotiations, voluntarily recognized the existence of the relation of master and servant, and the mine workers accepted that status, except that, for reasons satisfactory to themselves, they refused to work until certain of their demands were met, and a contract entered into meeting such demands.

The principal contention of the claimants is that when the contract between the mine workers and operators expired on March 31, 1939, there being no contract of employment, and the miners refusing to work without such contract, the stoppage of work was not caused by a labor dispute, but by the failure to agree upon a contract. We think it absolutely true that the mine workers ceased to work because their representatives had not been able to agree with like representatives of the operators on a contract covering terms of work; but we propound the question, why was not such contract entered into? The answer, we think, is that such failure grew out of differences of opinion, existing between the representatives of the mine workers on the one hand, and of the operators on the other, which, in this instance and in the final analysis, reduced itself to a question of whether or not the mines should be made union shops—that is, that while the operators had the right to employ qualified miners, such miners were required thereafter to become members of the mine workers' union, if they were not already such members. That certainly was a dispute. It began not later than March 28, 1939, and was the subject of dispute, contention and disagreement for some six weeks thereafter. This record indicates that if the mine workers had accepted the proposition of the operators to renew the 1937 con-

tract in all of its terms, there would have been no cessation of work; and likewise it indicates that if the operators had agreed to the proposition for a union shop, or a closed shop, or the removal of the penalty clause there would have been no cessation of work. If the contending parties had agreed upon any one of these points there would have been a contract and no cessation of work. The reason for the stoppage of work was because the parties could not agree upon the terms of a contract. There was a dispute between them as to which of the proposals so made should be adopted and incorporated in the contract. We have the plain and simple proposition of whether or not we are to consider the form or the substance of this matter. Entering into a written or express contract is a matter of form. It puts into effect that which has been agreed upon. The settlement of differences and conflicting contentions, and those things which enter into the reaching of an agreement is a matter of substance. There is where the dispute is and, in our judgment, it must be so held in this case.

Much stress is laid on the contention that stoppage of work could have been prevented, during the progress of the negotiations in New York, had the operators accepted the proposal of the mine workers, made March 16, 1939, to continue work under the expiring contract until a new contract should be signed, or the negotiations ended in a failure to agree. True it is that under said proposal there would have been no stoppage of work at the end of March. It is likewise true that there would not have been a cessation of work, for two full years, had the mine workers accepted either of the proposals of the operators, or had the operators agreed to either a closed shop or a union shop, or, probably, the removal of the penalty clause of the existing contract. In negotiations where each party thereto is seeking to better his interests, neither should be charged with the result of a failure on his part to accept a proposal made by the other, calculated, in his view of the matter, to yield an advantage to that other. Each party had the right to reject any proposal made by the other, and without prejudice. The operators say they re-

jected the proposal of March 16th, because they saw no reason why a contract should not be signed by April 1st. Whether other motives controlled or contributed to their rejection, we do not know. The parties to the controversy have not been charitable to each other in connection with this proposal, and its rejection. On the one hand, it is suggested that the operators were seeking to bring about a stoppage of work, in order to be able to dispose of surplus coal, and improve marketing conditions; on the other hand it is suggested that the mine workers were willing to prolong negotiations, and work in the meantime, until a season arrived when the urge on the part of the operators to reach an agreement, would, by reason of seasonable demands for their product, be stronger and more compelling. Other suggestions, uncomplimentary to the parties to the negotiations have been made. With all of these suggestions we have no concern, and we act on the assumption that the contending parties, in all their negotiations, were actuated by honest motives. The proposals and counter-proposals, and all debates, arguments and contentions in connection therewith, but serve to make clear that a bitter dispute was being carried on, in which each party was seeking an advantage over the other.

The question at issue has received the consideration of practically all of the courts in the Appalachian region. In Pennsylvania, the statute provided that, "If the employee's total unemployment is due to a voluntary suspension of work resulting from an industrial dispute, then he shall be ineligible for compensation for a further waiting period of three weeks * * *", and under this provision the Department of Labor and Industry allowed compensation upon the theory expressed in the following language:

> "The mine workers, therefore, whose employment has always been under a 'contract of hire' are unemployed because of the expiration of said contract and their resulting unemployment is not due to a voluntary suspension of work resulting from an industrial dispute but from the

> suspension of production operations by the mine operators in accordance with custom and tradition in the bituminous areas. No strike call has been issued, no attempt is being made to operate the mines and consequently the miner employee is unable to work."

It will be noted in the first place that the Pennsylvania statute does not render permanently ineligible for benefits workers unemployed due to voluntary suspension of work, but only postpones for an additional three weeks the date when benefits begin, so that the burden upon the Unemployment Compensation Fund is less heavy than it would be under our own statute. The Pennsylvania holding, at the most, granted compensation for three weeks longer than would have been granted had a different holding been made.

In the State of Ohio compensation was allowed under a statute which provided that, "No benefits shall be payable to any individual who has lost his employment or has left his employment by reason of a strike in the establishment in which he was employed, as long as such strike continues". *United States Coal Co. v. Unemployment Compensation Board of Review,* 66 Ohio App. 329, 32 N. E. (2d) 763. The Court of Appeals held, "If these claimants were engaged in a strike they are not entitled to benefits, otherwise they are entitled to them." It is not contended that this holding supports the position of the claimants in this case, because of the widely different provisions of our statute from that of Ohio, although some expressions of the court are relied upon by the operators as sustaining their view that the failure to reach an agreement was a labor dispute. There seems to have been a decision of a Board of Review of the State of New York, upholding the contention of the claimants to benefits under the laws of that state, but the circumstances surrounding such decisions have not been disclosed, and we are unable to appraise such decision, or apply it to the case before us.

In Maryland compensation was allowed by the commission having the matter in hand, it being held that no labor

dispute existed in the matter of the miners' claims, and that stoppage of work was due to the refusal of the operators to agree to a resolution proposed by representatives of the miners, and that the operation of the collective bargaining statute could not, by force of law, make the miners who had earned credits under the state unemployment act participate in a labor dispute. This holding was made with respect to the 1939 stoppage of work. However, in 1941, the Maryland Board of Review changed this holding and refused compensation to miners claiming benefits accruing on and after April 2, 1941. The Board of Review held that the facts of the case decided by it differentiated it from the former case. However, it held: "* * * but if this be not correct the Board hereby expressly overrules its previous decision and holds that when a stoppage of work exists and that stoppage is due to a labor dispute, as here found, that the Maryland statute prohibits the Board from granting and disqualifies the employee from being entitled to benefits."

The question has been considered by the courts of last resort in the States of Alabama, Kentucky and Tennessee, and a circuit court in the Commonwealth of Virginia. The Virginia case grows out of a statute, in which it is provided that the workers shall be disqualified for benefits, "For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed", subject to certain exceptions which are not important to the issue in this case. Compensation was denied by the Virginia Unemployment Compensatoin Commissioner, which action was sustained by the Circuit Court of Tazewell County, but the question was not considered by the Supreme Court of Appeals of Virginia, the appeal being dismissed on jurisdictional grounds.

In *Ex Parte Pesnell*, 240 Ala. 457, 199 So. 727, the Supreme Court of Alabama under a statute which provided that, "employees shall not be eligible for benefits for any week in which his total or partial unemployment is di-

rectly due to a labor dispute still in active progress in the establishment in which he is or was last employed," and held that "Evidence, that union would not make contract with coal mine operators for district including Alabama until an agreement for Appalachian area was reached, except a work-pending agreement binding operators to accept certain provisions in any agreement reached for Appalachian area, and that operator of mine at which member of union claiming unemployment compensation benefits was employed would not accept such work-pending agreement, established a 'labor dispute' precluding recovery of unemployment benefits."

The question was considered by the Court of Appeals of Kentucky, in *Barnes* v. *Hall*, 285 Ky. 160, 146 S. W. (2d) 929. The statute in that state provides that no worker shall be paid benefits for any period of unemployment with respect of which the commission finds that "a strike or other bona-fide labor dispute which caused him to leave or lose his employment is in active progress in the establishment in which he is or was employed, except that waiting periods may be served and benefits may be paid, unless the employer notifies the commission in writing within seven days after the beginning of such alleged strike or labor dispute of the alleged existence of such strike or labor dispute. For the purpose of this paragraph a lock-out shall not be deemed to be a strike or bona fide labor dispute and no worker shall be denied credit for a waiting period or be denied benefits by reason of a lock-out." The court held that in the absence of a definition of the term "labor dispute", the legislature intended to use the term in the same sense as it was used in the previously enacted National Labor Relations Act and the Norris-La Guardia Act. It further held that where coal miners refused to accept renewals of existing contracts, not because the renewal contract imposed substantial disadvantages, but simply because they sought elimination of the penalty clause, or insertion of the closed shop clause, there was a labor dispute and not a lockout, and that miners were not entitled to unemployment benefits under the Kentucky statute; and further held that,

"The purpose of Unemployment Compensation Act was to provide employment for unfortunate victims of a maladjusted economy who are unable to obtain suitable work at a living wage, not to enable those who are offered continuation of existing employment to refrain from work until they have secured additional advantages."

The question was also considered by the Supreme Court of Tennessee, in *Block Coal & Coke Co. v. United Mine Workers of America*, 177 Tenn. 247, 148 S. W. (2d) 364. The Tennessee statute provides that, "An individual shall be disqualified for benefits: * * * (d) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a labor dispute which is in active progress at the factory, establishment or other premises, at which he is or was last employed * * *", and it was held that, "Where representatives of coal miners and operators fail to reach agreement concerning modification of existing contract prior to expiration of contract, at which time work at mine ceased under a mutual understanding until an agreement was eventually reached, miners' unemployment was due to a 'labor dispute' and they were not entitled to unemployment compensation under statute disqualifying person unemployed because of labor dispute in progress at premises at which he is or was last employed", and further, "Where representatives of coal miners and operators were unable to reach agreement concerning modification of existing contract prior to expiration thereof, at which time work at mine ceased under mutual understanding until an agreement was eventually reached, miners were not entitled to unemployment compensation on the theory that their unemployment was not due to a 'labor dispute', but was due to lack of a new contract subsequent to expiration of existing contract, since lack of new contract was due to a 'labor dispute.'". One member of the court dissented from this opinion, and his dissent will be found in 149 S. W. (2d) 469, the position of the dissenting judge being that, "It seems perfectly clear that claimants ceased to work on April 1, 1939, because they had no working con-

tract with the appellants, and not because of any labor dispute in active progress."

It is interesting to note that all of the cases we have cited and discussed grew out of the identical controversy between the mine workers and operators which resulted in the joint conference in New York, in March, April and May, 1939. So far as we can observe from the decisions referred to, these cases were decided upon substantially the same evidence as that presented in the case at bar. The discussion in all these cases will show that they were deciding the identical question which confronts us, because there is no substantial difference in the statutes considered, and we can safely affirm that the contention that the controversy between the mine workers and operators was, in fact, a labor dispute, is sustained by an overwhelming weight of authority, and the unanimous holdings of the courts of last resort which have considered the question. In the Kentucky and Tennessee cases holdings of inferior courts were reversed, but we think it will be admitted that law is established by the holdings of courts of last resort.

We recognize that the case at bar must be decided on the statute in effect on April 1, 1939, and there is dispute as to what that statute means and the legislative intent in respect thereto. We think it must be conceded that the legislature has wide, if not plenary, powers in respect to what a labor dispute is, the definition thereof, the rate of unemployment assessments, and the benefits to be paid. The legislature is a continuing body, its proceedings are public acts of which we take judicial notice, and where disputes arise as to any of its acts, and an opportunity is afforded it to interpret by defining the terms of former statutes, or otherwise, it has the right to do so, and such action may throw light upon its intent in the first instance.

At the Regular Session of the Legislature, 1941, Chapter 97, the Unemployment Compensation Act, was amended, and the following language was added to subsection 4, Section 4, Article 6 of the original act:

"\* \*. \* No disqualification under this subsection shall be imposed if the employees are required to accept wages, hours or conditions of employment less favorable than those prevailing for similar work in the locality, or if employees are denied the right of collective bargaining under generally prevailing conditions, or if an employer shuts down his plant or operation or dismisses his employees in order to force wage reduction, changes in hours or working conditions."

This amendment was enacted as Senate Bill 101. The legislature, at the same session, had before it two other bills, Senate Bill 170 and House Bill 371. These bills were closely similar to Senate Bill 101, which was enacted. These bills were referred to a committee of the body of the legislature in which they were respectively introduced. Both Senate Bill 170 and House Bill 371 contained this further provision following immediately the amendment above quoted and as part of subsection 4:

"*Provided, however,* that the loss of employment resulting from the expiration of an existing joint-wage agreement by reason of failure to agree upon a new joint-wage agreement, and until negotiations for a new joint-wage agreement are terminated by joint action of both parties or by either party thereto, shall not constitute a labor dispute."

The legislature failed to enact this proposal into law. It is quite apparent that if enacted it would have covered the question involved in the case at bar. Whether it should be given any effect as to the supposed legislative intent with respect to the original act is doubtful. Two implications might reasonably be drawn from the failure of the legislature so to amend the original act. On the one hand, from the standpoint of claimants, it might be contended that the legislature believed its first enactment was clear, in which event no explanatory amendment would have been necessary. On the other hand, the contention might be made, on the part of the operators, that the refusal to make this proposed amendment indicated the legislative intent not to except, as to the original

act, the situation described in the amendment from the ordinary and accepted definition of a labor dispute. We do not give to the failure of the legislature to enact this amendment any decisive force or effect, and we fully recognize the limitations which should be drawn around the use of subsequent proposals as bearing upon the intent of the legislature as to preceding enactments. However, we are inclined to the opinion that the failure of the legislature to accept the views asserted by the mine workers in this case, has persuasive force in support of the view that the legislature has been, at all times, unwilling to put into legal effect a definition of a labor dispute which would permit the payment of unemployment benefits under the circumstances here considered. Courts are not disposed to legislate into statutes, by interpretations, a meaning which the legislature itself, when offered opportunity to do so, is unwilling to sponsor.

We have discussed this case so far without any particular regard to the consequences of our decision upon the Unemployment Fund. If the legislature, in clear language, had provided for the payment of benefits in a case such as the one at bar, we would not be justified in interfering with its plain purpose, because of any possible effect upon the fund, either now or in prospect; but where that meaning becomes a matter of dispute, and when it is reasonably apparent that the future of the fund may be endangered by giving to the act an interpretation which would permit benefits to be paid to men voluntarily unemployed by reason of labor controversies, known to have existed in the past, and likely to exist in the future, we say that, in our opinion, the legislature did not intend that the fund should be so used, and thereby diverted from its true purpose, except in those cases where the statute relieves workers of the obligation to work, when employment is offered. As one of the courts from whose decision we have quoted said: "The purpose of Unemployment Compensation Act was to provide employment for unfortunate victims of a maladjusted economy who are unable to obtain suitable work at a living wage, not to enable those who are offered continuation of exist-

ing employment to refrain from work until they have secured additional advantages." We subscribe to that view. Here the mine workers were voluntarily idle, because they followed their organization in an attempt to better their condition. They sought additional advantages, as they had the right to do; but in exercising that right they became involved in a labor dispute, which, under our statute, prevents them from receiving unemployment benefits by reason of the continuance of such dispute. In our opinion that is what our legislature meant by the original act, and we think that, in effect, it reiterated its intent at its Regular Session of 1941, when, by its inaction on a proposed amendment embodying a different view, it failed to give to the statute a meaning, for the future, in harmony with that which we are now asked by the claimants to give to the language used in the original statute. In the face of the legislative decision on the subject indicated above, we are not disposed to give to the statute a meaning which the legislature has declined to give.

One other thing should be made clear. The claimants, and those associated with them in their claims, should not be penalized for asserting their right to more satisfactory terms and conditions of employment, and the statute which we have interpreted does not do so. It simply provides, and in interpreting the same we hold, that when employees engage in a labor dispute over wages, terms and conditions of employment, or any one of them, and seek to better their permanent condition by becoming voluntarily unemployed, they must bear the burden entailed thereby.

The order of the Circuit Court of Kanawha County is affirmed.

*Affirmed.*

LOVINS, JUDGE, dissenting:

I am not in accord with the views expressed in the majority opinion. The vital question presented by this record may be summarized:

Was the unemployment of claimants "due to a stoppage of work which exists because of a labor dispute at the * * * premises at which he was last employed * * *?" On this question the decision herein turns and likewise it is on this point that the basic difference of opinion between myself and the majority of the Court arises.

My reasons for answering the question in the negative are based chiefly upon the belief that the Unemployment Compensation Act should be liberally construed in view of the expression of legislative purpose set forth in the Act itself and the facts and circumstances of this case.

The declaration of legislative purpose is as follows:

"Section 1. The purpose of this chapter is to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment. In furtherance, of this objective, the Legislature establishes a compulsory system of unemployment reserves in order to

" (1) Provide a measure of security to the families of unemployed persons.

" (2) Guard against the menace to health, morals, and welfare arising from unemployment.

" (3) Maintain as great purchasing power as possible with a view to sustaining the economic system during periods of economic depression.

" (4) Stimulate stability of employment as a requisite of social and economic security.

" (5) Allay and prevent the debilitating consequences of poor relief assistance.

"To give effect to these purposes the Legislature establishes the following system in the belief that the purposes are reasonably within the sphere of governmental control and that the agencies created for their accomplishment are the fairest and most effective devices now available."

From this declaration it becomes apparent that the legislature desired to eliminate, so far as possible, certain disturbing and baleful factors in our economic and social system. I concede that such a far-reaching law, fraught with so many important, if not grave consequences,

should be administered with caution, and be surrounded with safeguards to prevent frustration of the purposes thus announced. On the other hand, it is only just to say that the purpose of the legislature should not be defeated by a narrow and technical application, and I believe that such an application has been made by the majority of the Court. Such legislation, with its laudable motives and purposes as expressed therein should be liberally construed. I would base such a construction upon the following principles as enunciated in Lewis' Sutherland Statutory Construction, Second Edition:

"The law favors a liberal construction of certain statutes to give them the most beneficial operation.—Two classes of statutes are liberally construed—remedial statutes, and statutes which concern the public good or the general welfare." Sec. 582. "The modern doctrine is that to construe a statute liberally or according to its equity is nothing more than to give effect to it according to the intention of the lawmaker, as indicated by its terms and purposes. This construction may be carried beyond the natural import of the words when essential to answer the evident purpose of the act; so it may restrain the general words to exclude a case not within that purpose." Sec. 589. "Where the intent of the act is manifest, particular words may have an effect quite beyond their natural signification in aid of that intent." Sec. 590.

The inevitable result of a strict construction and application of the Act herein is to defeat the purpose and intent of the legislature. May I be permitted to say that in due time, if the policy of compensation for unemployment appears to be wrong, unwise or impracticable, the legislature in its wisdom will repeal or modify the law.

The majority opinion recognizes that practically all of the incidents of claimants' employment—retention on the company rolls, extension of credit at stores, occupation of company houses and continuance of hospital, medical service and insurance benefits, were carried on throughout the period of inactivity, excepting, of course, work and the payment therefor. This was all done by agreement, apparently, as was the maintenance work within the min-

ing operations. As noted in the majority opinion, neither the operators nor the claimants expected any work to be done, pending the effectuation of a new contract, and, for the most part, no attempt was made to operate the mines. Everything was held in readiness for the resumption of work as soon as the agreement, was reached. Having in mind the liberal rules of construction which should govern statutes of the character here involved, I, therefore, fail to see why the stoppage of work was due to a labor dispute. My view is that the stoppage was due to the failure to reach an agreement, upon the expiration of the old contract, pursuant to which the negotiations for the new agreement to take the place of that which had expired were being carried on. The contract which expired on March 31st called for these negotiations to begin on March 14th. This was a method, agreed upon by the operators and the claimants' representatives, of circumventing a labor dispute, in my opinion. The majority opinion concedes that neither the claimants nor the operators should be charged with the result of the failure of the other to accept the various proposals, and that the conferees on each side had the right to reject proposals without prejudice; further, it is not said that the negotiations beginning on March 14th constituted a dispute. With that in mind, how can it be said that the very same negotiations suddenly changed into a dispute, as the majority opinion says, beginning "not later than March 28th." By thus setting the date for this curious metamorphosis, the majority would even deprive the joint conference of three days of agreed-upon negotiations. Can it be that the parties to the old contract agreed to have a dispute? The conference seems to have continued by consent after March 31st. Such a continuance was, in my mind, no more of a dispute than the original conferences of March 14th, and it must be remembered that no deadline was set by the old contract for the formation of the new working agreement. The fact that the negotiations were prolonged for some six weeks beyond the date of expiration of the old contract because each side at the conference table insisted upon certain contractual provisions with

which the other side would not agree, does not serve to make a dispute out of that which was a negotiation a short time before, since, basically, it was merely a failure to agree upon the terms of the contract. Though, as the majority opinion points out, it may be true that the parties to the controversy have not been charitable toward one another and the discussion may have been bitter, I cannot see why such factors should make these negotiations a labor dispute within the terms of a statute which merits a liberal construction by the courts.

In the case of *United States Coal Co.* v. *Unemployment Compensation Board,* 66 Ohio App. 329, 32 N. E. (2d) 763, involving the same factual background and to which reference is made in the majority opinion, the Court of Appeals of Ohio said:

"There was simply a conference attempting to work out an agreement between the interested parties. The only contract existing between them had ended. No duty rested upon either the operators or the miners. The operators were under no obligation to keep the mines open. The miners were under no obligation to work. There was no contractual obligation. * * * As we view it, it is not necessary to fix the blame for delay in negotiations. It is sufficient to say that they were delayed and that no contract existed."

A careful evaluation of the record shows that the stoppage of work was caused by the non-existence of a contract between the employers and the employees. It may be that the employees lived in houses belonging to the employers, enjoyed credit at stores owned by the employers and other incidents of employment, but that does not necessarily fix nor determine the relationship between employer and employee. The employee did not work, the employer did not pay. No services were rendered and no wages paid. It seems that the necessary facts to create the relationship of employer and employee were absent. The dissent of Justice Dehaven in the case of *Block Coal & Coke Co.* v. *United Mine Workers of America,* 177 Tenn. 247, 149 S. W. 2nd, 469, in my opinion, ex-

presses the correct view: "With the expiration of the contract at midnight, March 31st, claimants' employment thereunder ceased. They became unemployed individuals pending the negotiations of a new contract." Further, "It seems perfectly clear that claimants ceased work on April 1, 1939, because they had no working contract with the appellants, and not because of any labor dispute * * *."

The majority opinion attaches considerable importance to the action of the 1941 legislature, in failing to amend subsection 4, section 4, article 6 of the original act, by the addition of a proviso which would have covered the questions herein, although such a proviso was included in Senate Bill 170 and House Bill 371, as introduced and referred to the committees on the judiciary, in the Senate and House, respectively. It is also pointed out that subsection 4 was amended in another respect by Chapter 97, Acts of that session (Senate Bill 101). The proviso just referred to, and subsection 4 as amended are set forth in full in the majority opinion and will not be repeated here. In saying that considerable importance is given this legislative action, I may be guilty of an understatement, for the references to same in the majority opinion are as follows:

"We are inclined to the opinion that the failure of the legislature to accept the views asserted by the mine workers in this case, has *persuasive force* in support of the view that the legislature has been, at all times, unwilling to put into legal effect a definition of a labor dispute which would permit the payment of unemployment benefits under the circumstances here considered. Courts are not disposed to legislate into statutes, by interpretation, a meaning which the *legislature itself*, when offered opportunity to do so, *is unwilling to sponsor*", and "In our opinion that is what our legislature meant by the original act, and we think that, in effect, *it reiterated its intent* at its Regular Session of 1941, when, *by its inaction on a proposed amendment* embodying a different view, it failed to give to the statute a meaning, for the future, in harmony with that

which we are now asked by the claimants to give to the language used in the original statute", also, *"In the face of the legislative decision* on the subject indicated above, *we are not disposed to give to the statute a meaning which the legislature has declined to give."* (Emphasis mine.)

It seems unique to me that these statements follow an assertion that it is "doubtful" whether the failure of the legislature to enact the proviso should be given any effect as to legislative intent because of two contrasting implications arising therefrom and also, the further assertion that the failure to enact the proviso is not given any decisive force or effect. However, two questions of greater importance arise in my mind in connection with the majority opinion's treatment of the legislative proceedings. First: It argues, without citation of authority, that where disputes arise as to acts of the legislature and an opportunity is given the legislature to "interpret" by defining the terms of a former statute, "or otherwise", it may do so, and throw light on its original intention. This smacks of an encroachment upon the judiciary to begin with, in that disputes as to a legislative act may be taken to the enacting body for interpretation. Legislative power to amend an existing enactment cannot be denied, however, in this case, the reasoning of the majority can only be supported by the inaction or negative action of the legislature, further resting upon the violent assumption that the legislature was cognizant of disputes as to the meaning of its prior enactment. The subjects of judicial notice are many and varied, but I doubt that this or any other court can with propriety recognize that a legislature knew about the existence of a dispute as to the meaning of certain language in a prior enactment.

Second: The rejection of an amendment to a proposed statute, or the failure to enact a proposed statute in its entirety, has been recognized as a part of the legislative history of statutes and, in a proper case, looked to as an extrinsic aid in seeking legislative intent. *McDonald & Johnson* v. *Southern Express Co.*, 134 F. 282; *Peoples Gas Co.* v. *Ames*, 359 Ill. 152, 194 N. E. 260; *Covington* v. *Tax*

*Commission,* 257 Ky. 84, 77 S. W. 2d 386, citing 59 C. J. 1017; *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 55 S. Ct. 333, 79 L. Ed. 780, citing *Finlayson* v. *Shinnston,* 113 W. Va. 434, 168 S. E. 479; *Murray Hospital* v. *Angrove,* 92 Mont. 101, 10 P. 2d 577; *United States* v. *United Shoe Mach. Co.,* 264 Fed. 138, 174 (Aff. 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708). In all of these cases, which I believe are typical of the great weight of authority, the legislative action of rejection of an amendment occurred at the same time, or during the same legislative session at which the statute itself was originally adopted and not, as is the case at bar, at some subsequent session. Our unemployment compensation law was enacted at the extraordinary session of 1936, or almost five years before the introduction of Senate Bill 170 and House Bill 371, herein mentioned, at the Regular Session of 1941. During that time, or for that matter, during the time between one regular session of the legislature and the next, the personnel of the legislature changes, also, the very meaning of words changes with the passage of time. How then can we gauge what the legislature meant, in the manner relied upon by the majority opinion. On this point I would adopt this excerpt from the opinion in *Murray Hospital* v. *Angrove, supra,* "* * * it is the contemporaneous action and construction by the legislature to which we may resort in order to determine the intent of that body in enacting a law or rejecting an amendment thereto. No case has been cited, or found, holding that the records and journals of subsequent sessions of the legislature have any probative value in determining the intent of the legislature in passing laws already on the statute books * * *."

In addition, a close perusal of the journals of the House of Delegates and the Senate of the 1941 Legislature shows that House Bill 371, and Senate Bill 170, did not receive the consideration of either body. House Bill 371 was amended in committee and reported back with a favorable recommendation. The committee amendments do not appear in the journal because the bill was laid on the table on second reading, so I am unable to attach any significance to the legislative history of House Bill 371 as

bearing upon legislative intent to exclude the proviso in question. Senate Bill 170 was introduced and referred to committee as hereinbefore noted; no other legislative action thereon is shown by the Senate Journal. I believe that it should appear that rejection of an amendment was effected by a vote of the members of the particular legislative body before such rejection can be regarded as an indicia of legislative intent, otherwise, conjectural elements and vague possibilities would be permitted to thrust themselves into the inherently elusive determination of intent. In *Lane* v. *Kolb,* 92 Ala. 636, 9 So. 873, the view is expressed that the failure finally to include an amendment cannot be considered. See Crawford, Statutory Construction, sec. 216, p. 384. *Finlayson* v. *Shinnston, supra,* refers to the state senate's rejection of Senate Joint Resolution No. 1, introduced at the extraordinary session of 1932, as bearing upon legislative intent in the adoption of a joint resolution, *at the same session,* providing for the submission of the tax limitation amendment to the electorate. The resolution (S. J. R. 1), requiring a two-thirds vote, was adopted, failing by a 16-14 vote; a motion to reconsider that vote prevailed, 18-12 and finally a motion to indefinitely postpone further consideration of the resolution also prevailed. I submit that such a rejection by the legislature does not appear in the proceedings anent Senate Bill 170 and House Bill 371.

The length of this discussion of legislative action or inaction and its indication of meaning and intent is justified, I believe, by the important position it has been accorded in the majority opinion as a bulwark supporting the conclusions therein announced. I have included quotations therefrom in this dissenting note which indicate to me that this particular point is considered to be of major importance regardless of any statement which might indicate the contrary.

For the reasons herein stated, I disagree with the majority of the Court and would reverse the judgment of the Circuit Court of Kanawha County.