RALPH R. PICKENS, *et al.*

*v.*

JACK KINDER, *Clerk, etc.*, BOARD OF REVIEW *etc., et al.*
CLEMENT R. BASSETT, *etc. and* FMC CORPORATION,
*a corporation*

(No. 12905)

Submitted May 4, 1971.                Decided June 1, 1971.

122

*R. L. Theibert,* for petitioners.

*Jackson, Kelly, Holt & O'Farrell, David D. Johnson,* for respondents.

BERRY, JUDGE:

This case involves a proceeding upon a writ of certiorari granted by this Court on December 8, 1969, to the Circuit Court of Kanawha County, to review the decision of the Circuit Court of April 11, 1969, in a group case, denying unemployment compensation to the petitioners, Ralph Pickens and others, employees of the FMC Corporation, South Charleston, Kanawha County, West Virginia, a firm engaged in the manufacture of chemical products, for a period of idleness that occurred during a labor dispute at the plant from June 20, 1967 until September 27, 1967. In response to the writ of certiorari provided for in Code, 21A-7-27, as amended, the record of the case was brought to this Court and the case was submitted for decision on May 4, 1971, upon arguments and briefs on behalf of the parties involved. This proceeding having passed through a series of hearings and appeals before coming to this Court on a writ of certiorari, the initial decision was made by the Deputy Director of the West Virginia Department of Employment Security in which it was held that the claimants or petitioners were eligible for unemployment compensation benefits, but were disqualified for a period of seven weeks with a reduction of six times their respective weekly benefit amounts, under the provisions of Code, 21A-6-3(1), because they left their most recent work voluntarily without good cause involving fault on the part of the employer.

The employer appealed the decision of the deputy and the matter was heard by a trial examiner employed by the Board of Review of the Department of Employment Security to hear appeals from the decisions of the deputy of the department. The trial examiner held on February 6, 1968, after a lengthy hearing, that the claimants, although involved in a labor dispute, were eligible and not disqualified from receiving benefits, because there was no substantial curtailment of the plant's operations and that since the facts brought it within the labor dispute provisions of the statute, Code 21A-6-3(4), as amended, the claimants were not severed from employment and no

other type of disqualification should apply and there being no stoppage of work, benefits should not be denied.

The decision of the trial examiner was appealed by the employer to the Board of Review of the West Virginia Department of Employment Security which consists of three members appointed by the Governor of West Virginia. This Board reviewed the decision of the trial examiner and on April 3, 1968, reinstated the decision of the deputy which had held that there was a seven weeks disqualification with reduction of six times the weekly benefit amount for each claimant for the voluntary quitting of work on the part of the claimants without good cause involving fault on the part of the employer.

Both sides appealed the case to the Circuit Court of Kanawha County, which is charged with the duty under the law of deciding unemployment compensation cases on appeal from the board of review from any area of the state. The two appeals were consolidated and heard together in the Circuit Court which held on April 11, 1969, that the claimants were not entitled to any compensation for the period of the strike, because they were neither partially nor totally unemployed. The decision of the Circuit Court based on its written opinion of April 2, 1969, reversed the decision of the board of review and placed its decision upon a ground not theretofore decided by any of the other officials handling the case, either initially or upon appeal, although the trial examiner in reaching his conclusion had hit near the point in stating that there was no severance of employer-employee relationship.

The facts in this case are relatively simple and uncontradicted and the disposition thereof is governed entirely by a matter of law.

Prior to the labor dispute involved in the case at bar, about 700 of the company's employees, mostly hourly workers, were represented in collective bargaining by District 50, United Mine Workers of America, Local Union No. 12625, which later became independent of the mine union. The total employees of the plant numbered about

1050, 350 of whom were salaried, clerical, professional, technical and supervisory employees who did not belong to the union. A collective bargaining agreement was entered into on June 20, 1965, which contained a provision that it could be terminated by 60 days written notice in advance of the expiration date of June 20, 1967, and if it was not so terminated it would automatically be renewed for an additional year.

The union notified the employer by letter dated April 17, 1967, that it was terminating the contract. No notice was given by the employer. The union and the employer then entered into negotiation or bargaining meetings in an attempt to agree on a new contract to replace the old one, but their efforts were ineffective before the expiration date of the contract and it was recognized that a strike by the employees would take place. Apparently, both the union and the employer endeavored to have their contentions contained in the new contract, the union contending for certain benefits for the employees and the employer contending for a provision called "Maintenance Utilization Program" in order to train workers to do jobs other than those of a specific craft of limited work jurisdiction.

The employer made plans to keep the plant operating during the strike as much as possible in order to avoid the adverse economic effects on the company in connection with a long strike, and the non-union salaried, clerical, professional and supervisory personnel were instructed to take over the production and maintenance work. It was anticipated that the union members would refuse to continue to work after the 6:30 shift on June 20, 1967, and consequently, the non-union employees were sent into the plant about one or one and one-half hours before the deadline of 6:30, when the contract terminated, to begin relieving the union men who were about to leave the plant and to replace the security guards who were also members of the union in order to maintain security of the plant when the strike started. The new shift did not

report for work and the plant gates were closed but some of the employees came back into the plant to obtain their clothing and other personal articles. The union began picketing the plant at 6:30 a.m. and continued to do so 24 hours a day for the duration of the strike at all of the seven normally used plant gates, with some of the pickets carrying signs indicating that they were on strike, the signs reading "No contract no work."

During the period of the strike, work was available for any employee who would have desired to enter the plant to work; and all during this time the employer was operating the plant at a reduced level.

During the strike no replacements were hired and no person quit permanently or was discharged, with the exception of about 18 men who are not involved in the decision of this case as their status is subject to separate determination by the local unemployment compensation officials as they apparently terminated their employment in some manner, the details of which are not involved herein. The same work force who were on strike appeared for duty and returned to work in their regular positions when the strike was over.

During the strike all of the men involved in this case were carried on the payroll as employees, and their pension rights and insurance premiums continued in force. It appears that some of the insurance premiums were paid by the union, and some by the employer and that after the strike certain reimbursements or adjustments were made with the union for certain expenditures made therefor. The salaried workers manned the production and critical maintenance posts and worked for a few days at the rate of 84 hours compared with the normal 40 hours a week, after which a staggered schedule was worked out which required the salaried employees to work for about 56 hours a week for the rest of the strike. Much of the work performed by the salaried employees in their normal positions had to be abandoned. The evidence indicates that during the strike there were 2800 hours worked a day

compared with the normal 6500 manhours worked, and a great backlog of unperformed tasks existed in the normal occupations of the salaried workers.

Two production departments, Caustic Potash and Chloral, were completely shut down. Steam and electricity were cut about ⅓ and construction work was curtailed to the point where $100,000 in overtime pay was expended in order to catch up with the work after the strike was over. It is indicated that as the result of the strike the employer was subjected to a loss of about $2,000,000.

It appears from the evidence that the production of items for sale was about 80 or 85% normal, all of which was done with about 50% of the normal production force and at a cost of lost time in non-production phases. After the strike the employer paid the employees for about 400 weeks of vacation pay during which time they continued to work for the extra compensation instead of taking vacations.

The picketing of the plant was maintained in 4 to 6 hour shifts with most of the employees participating in the picketing. In some instances the strikers were given $20 weekly "grocery orders" by the union.

It is contended on behalf of the petitioners that the evidence indicates there was a lockout because the union employees were relieved of their duties by salaried employees about one or one and one-half hours before the end of the 6:30 shift when the pickets appeared and the strike began; that the gates were locked and the men were not allowed to come back into the plant. However, the evidence shows that the men who desired to were allowed to come back into the plant to get their personal effects and then voluntarily left. It is also the contention of the employer, which is supported by the evidence, that the work was available for the men at any time they desired it; that their employment was not terminated, that neither were they discharged nor did they quit their employment during the period of the strike, and that their names

remained on the employment records during the entire time of the strike and that after the strike they all returned to their regular positions with the exception of the 18 men hereinabove mentioned who are not involved in this proceeding.

The decision of the circuit court was that the men were not partially unemployed because there was work available during the entire time of the strike and therefore there was no "lack of work" which is the requirement in order to determine the existence of partial unemployment, and that there was no "total unemployment" because the petitioners were never "separated from employment" because there was no total severance as required by the definition pertaining thereto contained in the Code.

Although there were several issues involved during the hearings in the case at bar, the circuit court did not consider or pass upon any issue except what was termed by it the "threshold * * * issue," that is, whether the petitioners were partially or totally unemployed. The circuit court held that they were neither partially nor totally unemployed and denied unemployment compensation benefits to the petitioners herein. This is the only issue to be decided in the case presented here because this Court will not decide nonjurisdictional questions which were not considered or decided by the circuit court. *Wilson* v. *Hix,* 136 W.Va. 59, 73, 65 S.E.2d 717; *McCloud* v. *Hix,* 137 W.Va. 148, 70 S.E.2d 589; *Pettry* v. *C. & O. R.R. Co.,* 148 W.Va. 443, 135 S.E.2d 729; *In Re: Tax Assessment of Real Estate of Morgan Hotel Corporation,* 151 W.Va. 357, 151 S.E.2d 676; *Velma Irene Mowery* v. *Russel Hitt, et al.,* 155 W.Va. 103, 181 S.E.2d 334 (1971). This principle is clearly stated in point 1 of the syllabus of the case of *Pettry* v. *C. & O. R.R. Co., supra,* in the following language: "This Court will not consider questions, nonjurisdictional in their nature, not acted upon by the circuit court as an intermediate appellate court."

It is clear from the statute dealing with unemployment compensation that benefits cannot be paid unless the

claimants are either totally or partially unemployed. Code, 21A-6-10 and 11, as amended. The statute defines total and partial unemployment, Code, 21A-1-3, as amended, "Total and partial unemployment" (1) and (2), as follows: "(1) An individual shall be deemed totally unemployed in any week in which such individual *is separated from employment* for an employing unit and during which he performs no services and with respect to which no wages are payable to him." [Emphasis supplied.] "Separated from employment" referred to in the above quoted definition is defined in Code, 21A-1-3, as amended, in the following language: "'Separated from employment' means, for the purposes of this chapter, *the total severance whether by quitting, discharge, or otherwise, of the employer-employee relationship.*" [Emphasis supplied.]

It is clear from the evidence presented here that the petitioners were never separated from employment, because there was no total severance by quitting, discharge or otherwise of the employer-employee relationship. It has been specifically held by the Supreme Court of the United States that employees who go on strike do not sever their employer-employee relationship and such relationship continues during the entire time they are on strike and until such time as they quit or obtain employment elsewhere. *NLRB* v. *Mackay Radio & Telegraph Co.,* 304 U.S. 333; *NLRB* v. *Great Dane Trailers, Inc.,* 388 U.S. 26; *NLRB* v. *Fleetwood Trailer Co., Inc.,* 389 U.S. 375.

The statute defining separation from employment to be total severance either by quitting or discharge or otherwise was placed in the Code in 1949, and the case of *Homer Laughlin China Co.* v. *Hix,* 128 W.Va. 613, 37 S.E.2d 649, which indicates a different definition is not applicable at the present because it was decided before the 1949 amendment to the Code. However, the case of *Bennett* v. *Hix,* 139 W.Va. 75, 79 S.E.2d 114, decided in 1953, after the 1949 amendment, held that striking employees who intended to return to their jobs were not totally unemployed

where there is no showing of a separation from employment. It is clear from the evidence contained in the record that the petitioners were never separated from employment because there was no total severance from such employment by quitting, discharge or otherwise, and therefore, under the law governing such matter the petitioners were not totally unemployed as defined in Code, 21A-1-3, as amended, and therefore, are not entitled to benefits provided in Code, 21A-6-10, as amended.

It is equally clear under law governing such matters that the petitioners were not partially unemployed because there was no lack of work. Code, 21A-1-3, as amended, defines partial unemployment as follows: "(2) An individual who has not been separated from employment shall be deemed to be partially unemployed in any week in which due to *lack of work* he performs no services and with respect to which no wages are payable to him, or in any week in which due to *lack of full-time work* wages payable to him are less than his weekly benefit amount plus ten dollars." [Emphasis supplied.]

It is clear that the reason the petitioners were not working and receiving wages was not due to the lack of work available to them, but was due to the fact that they were engaged in a strike and were voluntarily not working although work was available to them. The old contract would have automatically remained in effect for a period of one year beyond June 20, 1967, if the union had not given the 60 day notice of termination. The employer never at any time gave any notice of termination of the contract. The petitioners indicated by their actions and signs carried on the picket line of "No contract no work" that they did not intend to return to work which was available until a new contract was obtained. The evidence clearly shows that they were not prevented from going to work; that the releasing of men one or one and one-half hours ahead of time on June 20, 1967, was for security reasons, and to allow the salaried employees to take over the petitioners' places. Any of the employees could have returned to work after the gates were closed as indicated

by the employees who returned to the plant to get their personal effects. It has been repeatedly held that a strike does not create a lack of work where work is available to the strikers during the strike. *Copen* v. *Hix,* 130 W.Va. 343, 43 S.E.2d 382; *Board of Review* v. *Hix,* 126 W.Va. 538, 29 S.E.2d 618; *Miners in General Group* v. *Hix,* 123 W.Va. 637, 17 S.E.2d 810.

It is contended by the petitioners that even if there was work available at the employer's plant for the petitioners during the period of the labor dispute that such work was not suitable work under the provisions of Code, 21A-6-6, as amended, wherein it is stated that: "Notwithstanding any other provisions of this chapter, no work shall be deemed suitable and benefits shall not be denied to an individual, otherwise eligible, for refusing to accept *new work* under any of the following conditions:

"(1) If the position offered is vacant due directly to a strike, lockout, or other labor dispute." [Emphasis supplied]

This contention is without merit because it has been uniformly held that under statutes reading as the one above quoted in this state the work available to the claimants at the employer's plant was not unsuitable as to them and that the work was not new work as far as the petitioners were concerned and the unsuitability was applicable only to strangers to the labor dispute involved or former employees who had terminated their employment prior to the dispute. *Davis* v. *Hix,* 140 W.Va. 398, 84 S.E.2d 404; *Merryman* v. *Administrator,* (Conn.) 181 A.2d 260; *Bilodeau* v. *Maine Employment Security Commission,* (Me.) 136 A.2d 522; *Barber* v. *Employment Stabilization Commission,* (Calif.) 278 P.2d 762. It therefore clearly appears that the petitioners are not eligible to obtain compensation benefits under the partial unemployment statute. Code, 21A-6-11, as amended.

From all of the evidence in the record of this case it is clear that under the statutory law and authorities

applicable thereto the petitioners involved in this proceeding were neither partially nor totally unemployed during the period of the strike at the employer's plant at South Charleston, and therefore, are not entitled to be paid unemployment compensation under the provisions of the unemployment compensation law of the State of West Virginia and the decision of the Circuit Court of Kanawha County is clearly right and is, therefore, affirmed.

*Affirmed.*