[S. F. No. 17127. In Bank. Jan. 29, 1946.]

WILBERT WILLIAMS et al., Appellants, v. INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS AND HELPERS OF AMERICA et al., Respondents.

Andersen & Resner, George R. Andersen and Herbert Resner for Appellants.

Charles J. Janigian, Thomas M. Carlson, and Thelen, Marrin, Johnson & Bridges for Respondents.

GIBSON, C. J.—Plaintiffs, skilled Negro shipyard workers, brought this action on behalf of themselves and approximately 2,000 other Negro workers similarly situated, to restrain defendants from interfering with their employment or reemployment because they are not members of certain local labor unions affiliated with the defendant International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America. The trial court sustained the demurrers of all defendants, discharged an order to show cause why a preliminary injunction should not issue and dismissed the action. Plaintiffs have appealed from the order of discharge and from the judgment of dismissal.

The complaint alleges in substance as follows: Plaintiffs are employees and former employees of defendants Permanente Metals Corporation and Kaiser Company, Inc. A written contract containing a provision for a closed shop is in effect between the employers and the International Brotherhood, which dispatches workers for employment at the shipyards through the agencies of defendant local unions. Negroes are not admitted to membership in the local unions, but plaintiffs were dispatched for employment at the shipyards without permitting or requiring them to become members. Subsequently, however, the unions attempted to compel plaintiffs and other Negro workers to become members of and pay dues to Negro lodges established under the authority of the International Brotherhood as auxiliaries to the local unions. These auxiliaries, it is alleged, are not bona fide labor unions but constitute schemes and devices whereby the defendant unions segregate Negro from non-Negro workers and discriminate against Negroes, the sole reason for the segregation and dis-

crimination being race and color. Various practices of the unions, provided for in the By-Laws Governing Auxiliary Lodges of the International Brotherhood, are set forth in the complaint and are challenged as discriminatory. Plaintiffs are willing to join the local unions upon the same terms and conditions as non-Negro workers, but they are not willing to join or pay dues to the auxiliary lodges.

The gravamen of the complaint is that the unions assert the right to obtain the discharge of the Negro workers under the closed shop contract because they are not members of the unions, although at the same time the unions will not admit Negroes to membership except under discriminatory and unequal conditions. In *James* v. *Marinship Corp.*, 25 Cal.2d 721 [155 P.2d 329], which was decided after the trial court acted in the present case, we held that an arbitrarily closed or partially closed union membership is incompatible with a closed shop; that a denial of union membership to Negroes on terms of equality with other workers is tantamount to wholly closing the union to them; and that injunctive relief will lie to prevent the maintenance of an arbitrarily closed union together with a closed shop.

Defendants point out, however, that the complaint filed herein does not allege that either the International Brotherhood or its local affiliates had attained a monopoly of labor in the locality, and, therefore, they contend, the complaint does not state a cause of action under the decision in the James case. Although it is true that the court in the James case treated the existence of such a monopoly as an important reason for granting relief, the decision, contrary to defendants' contention, was not made dependent thereon. The question was expressly reserved for future determination, but we noted, however, that some states, by statute, have declared *all* labor unions to be affected with a public interest and thus subject to regulation. (25 Cal.2d at p. 734.)

█ It is now established by a decision of the Supreme Court of the United States rendered since the James case, that a state has the power to prohibit discrimination on account of race, creed or color by any labor union with respect to membership or union services. (*Railway Mail Assn.* v. *Corsi*, 326 U.S. 88 [65 S.Ct. 1483, 89 L.Ed. 2072].) The contention was there made that a New York statute which prohibits a union from denying membership or equal treatment to anyone by reason of race, color or creed was con-

trary to the Fourteenth Amendment in that it abridged property rights and liberty of contract. The court replied that to so hold "would be a distortion of the policy manifested in that amendment which was adopted to prevent state legislation designed to discriminate on the basis of race or color," and, particularly applicable to the present case, the court stated that there was "no constitutional basis for the contention that a state cannot protect workers from exclusion solely on the basis of race, color or creed by an *organization, functioning under the protection of the state, which holds itself out to represent the general business needs of employees.*" (Italics added.) (65 S.Ct. at p. 1487.) Further, it should be noted that the New York statute was not limited in operation to unions having closed shop agreements, and no question of a labor monopoly in the locality was involved in the Corsi case. ▉ Although the relief granted in the Corsi case was derived from legislative authority, nevertheless, it is established that, where persons are subjected to certain conduct by others which is deemed unfair and contrary to public policy, the courts have full power to afford necessary protection in the absence of statute. (*James* v. *Marinship Corp.*, 25 Cal.2d 721, 740 [155 P.2d 329].)

▉ The failure to allege a monopoly of labor in the entire locality is not fatal to plaintiffs' cause of action insofar as the authorities relied upon in the James case are concerned. Although it is true that certain of the cases cited emphasize the fact that such a monopoly existed (see, for example, *Wilson* v. *Newspaper & Mail Deliverers' Union* (1938), 123 N.J. Eq. 347 [197 A. 720]; *Carroll* v. *Local No. 269* (1943), 133 N.J.Eq. 144 [31 A.2d 223]), in only one case was it stated that relief must be denied because of the failure to show that the union had obtained a monopoly over the labor market. (*Walter* v. *McCarvel* (1941), 309 Mass. 260 [34 N.E.2d 677].) In other jurisdictions relief has been granted against the maintenance of a closed shop and an arbitrarily closed union without requiring proof of a labor monopoly in the area. (*Dorrington* v. *Manning* (1939), 135 Pa.Super. 194 [4 A.2d 886]; *Wills* v. *Local No. 1067*, 26 Ohio N.P.N.S. 435; *cf. Lucke* v. *Clothing Cutters' & T. Assembly No. 7507, K. of L.* (1893), 77 Md. 396 [26 A. 505, 39 Am.St.Rep. 421, 19 L.R.A. 408].)

These decisions are based upon the theory that such collective labor activity does not have a proper purpose and constitutes an unlawful interference with a worker's right to

employment. The Restatement of Torts, section 810, has adopted this view, stating: "Workers who in concert procure the dismissal of an employee because he is not a member of a labor union satisfactory to the workers . . . are liable to the employee if, but only if, he desires to be a member of the labor union but membership is not open to him on reasonable terms." This rule is not founded upon the presence of a labor monopoly in the entire locality, and the reasoning is simply that it is unfair for a labor union to interfere with a person's right to work because he does not belong to the union although he is willing to join and abide by reasonable union rules and is able to meet all reasonable conditions of membership. No purpose appropriate to the functions of a labor organization may be found in such discriminatory conduct. Here the union's efforts are directed, not toward advancing the legitimate interests of a labor union, but rather against other workers solely on the basis of race and color.

█ The reasons why an arbitrarily closed union should not be permitted to exist together with a closed shop are stated in 1 Teller, Labor Disputes and Collective Bargaining (1940), at page 285, as follows: "Labor unions which close their ranks to the public thereby assume a sovereignty which is not theirs to assume. . . . The closed shop as an instrumentality of a labor union, membership wherein is reasonably open to the public, establishes a desirable rule governing industrial enterprise. The closed shop at the hands of a labor union which substantially excludes the public from its benefits, on the other hand, is a means whereby an anti-social monopoly is foisted upon the industrial body politic." This reasoning is applicable whether the monopoly is limited to a single plant or covers an entire community.

█ The public interest is directly involved because the unions are seeking to control by arbitrary selection the fundamental right to work. While the need for protection may be greater where the union has secured closed shop contracts covering all the jobs in the locality, this is only an aggravated phase of the general problem. The individual worker denied the right to keep his job suffers a loss, and his right to protection against arbitrary and discriminatory exclusion from union membership should be recognized wherever membership is a necessary prerequisite to work. A closed shop agreement with a single employer is in itself a form of monopoly, giving a third party, the union, control over at least the plant of the

signatory employer, and although such a labor monopoly is not in itself improper, it carries with it certain responsibilities, and the public clearly has an interest in preventing any abuse of it. As pointed out in the Corsi case (326 U.S. 88, [65 S.Ct. 1483, 1487, 89 L.Ed. 2072]), a labor union functioning under the protection of the state holds itself out to represent the general business needs of employees, and if, as it was there held, a state may protect workers from exclusion by *any* labor union, it is clearly warranted in doing so wherever union membership is a condition to employment although only a single employer is involved.

It is assumed in connection with another phase of the case that the shipyards are industries affecting interstate commerce and that the parties hereto are subject to the National Labor Relations Act. (49 Stats. 449, 29 U.S.C.A. § 151, et seq.) The act affords a further reason for granting relief because under its provisions it is unnecessary to show that the unions have a labor monopoly in the locality. The union as the bargaining agent of the employees selected in accordance with the act has the duty to represent *all* employees, without discrimination because of race or color, and it may be compelled to do so by judicial action. (*Cf. Steele* v. *Louisville & Nashville R. R. Co.,* 323 U.S. 192 [65 S.Ct. 226, 89 L.Ed. 173]; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U.S. 210 [65 S.Ct. 235, 89 L.Ed. 187].) The National Labor Relations Board has stated that where a union has obtained a contract requiring membership as a condition of employment, it does not have the right to compel the discharge of employees who are discriminatorily denied membership. (See *In re Larus & Bro. Co. Inc.,* June 30, 1945, 62 N.L.R.B. No. 134; *In re Rutland Courts,* 44 N.L.R.B. 587.)

The complaint, therefore, does not fail to state a cause of action merely because it does not allege that the union defendants have attained a monopoly of the supply of labor in the locality.

The union defendants contend that their demurrers were properly sustained on the ground that the complaint did not allege unreasonable discrimination against Negro workers. They say that the International Brotherhood is open to Negro members if they consent to segregation into separate auxiliaries and that this is not unreasonable discrimination. In addition to segregation, however, the complaint alleges specific provisions of the by-laws of the International Brother-

hood which would operate to place members of the auxiliaries in an unequal and disadvantageous position as compared with members of the local unions. Plaintiffs charge, for example, that the locals control, manage, and supervise all of the affairs and business of the auxiliaries whereas the auxiliaries have no voice or vote in the affairs of the supervising locals; that the auxiliaries are not allowed business agents or grievance committees to act for their members but must seek representation through the business agents of the local unions, "who refuse to act for the members of said auxiliaries"; and that members of the auxiliaries are dispatched to employment only through the agencies of the local unions and cannot obtain a change of classification of work from helper to journeyman without their approval. These union rules and practices were held discriminatory in *James* v. *Marinship Corp.*, 25 Cal.2d 721, 737-739 [155 P.2d 329], where it was further declared that since the Negroes were denied union membership on terms of equality with other workers, the effect was the same as wholly denying them membership.

 The union defendants next contend that the trial court did not have jurisdiction over the subject matter because, they assert, if an injunction were granted it would in effect destroy their closed shop contract and affect the status of the employees of the shipyards, and it would thus interfere with the rights of collective bargaining granted by the National Labor Relations Act. This contention was determined adversely to defendants in the James case. They now rely upon *Hill* v. *State of Florida*, 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed. 1782], which was decided after the James case. It was there held that a state has no power to impose conditions upon the rights of a union and its representatives to function as collective bargaining agents under the National Labor Relations Act.

There is nothing in the Hill case, however, that precludes a state court from enforcing against a labor union such rights of individual workers as are consistent with the provisions of the federal act. That act clearly does not give a union the authority to maintain a closed shop agreement together with an arbitrarily closed union membership. Moreover, the rights which plaintiffs seeks to enforce not only are consistent with the provisions of the federal act but appear to be affirmatively granted thereby. Section 9 (a) provides that the union selected

by a majority of the employees of a bargaining unit "shall be the exclusive representatives of all the employees in such unit" (49 Stats. 453, 29 U.S.C.A. § 159), and it is difficult to see how a union can fairly represent all employees of a bargaining unit if it arbitrarily excludes some from membership thereby depriving them of the opportunity to vote for union leaders and to participate in determining union policies. (See *James* v. *Marinship Corp.*, 25 Cal.2d 721, 735 [155 P.2d 329].)

An additional contention made by the employer in *Thompson* v. *Moore Drydock Co.*, *post*, page 595 [165 P.2d 901], should be considered here, since the allegations in the complaints are substantially the same and the cases were argued together in this court. It is contended that a cause of action is not stated against the employers because it does not appear that they have committed or threatened any wrong against plaintiffs. The complaints allege that the employers have enforced, or threaten to enforce, the closed shop contracts against plaintiffs by requiring them, upon penalty of discharge, to join the auxiliary lodges, thus subjecting them to discriminatory and unequal union rules set forth in the complaint. As held in the James case, an employer may be enjoined from indirectly assisting a union in carrying out discriminatory practices against Negroes through a closed shop contract (25 Cal.2d 721, 742). It is argued, however, that an injunction would place the employers in a dilemma in that it would require them to judge whether, after such an order, the union had ceased its discriminatory practices, and they argue that they would thereby be subjected either to a claim by a Negro that the injunction was being violated or to a claim by the union that it no longer discriminated against Negroes. The employers, however, will not be compelled to make such a decision. They need not look behind the notice from the union that an employee is not a member in good standing. They may accept the statements of the union officials who are in charge of providing work clearances not only to the effect that a particular worker is not a member in good standing but also to the effect that the union has ceased all unequal and discriminatory treatment within the terms of the injunction. Upon receipt of such a statement the employers may refuse to hire the Negro workers, and if the union has not given truthful information and if it has continued the enjoined discriminations, it alone, and not the

employers, will be subject to a charge of contempt. The primary responsibility for compliance with the order of the court is thus placed where it belongs—directly on the union. With the duties and responsibilities of the employers thus limited, there remains no force to their objection that they will be placed in an inescapable dilemma.

Defendants further contend that the trial court had discretionary power to deny a preliminary injunction. The record shows, however, that the order to show cause was discharged upon the sustaining of the demurrers without leave to amend and the injunction was refused solely on the ground that the trial court concluded that the action had to be dismissed because the complaint did not state a cause of action. Since the judgment of dismissal must be reversed, the trial court should consider the application for a preliminary injunction on the merits in accordance with the views set forth in this opinion.

The judgment of dismissal and the order discharging the order to show cause why a preliminary injunction should not issue are reversed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied February 25, 1946.