[S. F. No. 17685. In Bank. Nov. 1, 1948.]

JOHN HUGHES et al., Petitioners, v. SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent; LUCKY STORES, INCORPORATED, Real Party in Interest.

Edises, Treuhaft & Condon and Robert L. Condon for Petitioners.

Allan Brotsky, Benjamin Dreyfus, J. Bruce Fratis, Cecil F. Poole, Philip Adams, Robert Herman and Herbert Prashker, as Amici Curiae on behalf of Petitioners.

Hoey & Hoey and Francis Hoey for Respondent.

Edward D. Keil, George A. Connolly, Mitchell T. Neff, Willard S. Johnston and Orrick, Dahlquist, Neff & Herrington, as Amici Curiae on behalf of Respondent.

SCHAUER, J.—Petitioners through certiorari seek annulment of a judgment of the Superior Court of Contra Costa County by which petitioners were found guilty of contempt of court for wilfully violating a preliminary injunction. The injunction restrained petitioners and certain other individuals, as well as five named unincorporated associations, ''from picketing or taking position in front of any of the places of business of Lucky Stores, Incorporated, for the purpose of compelling . . . [Lucky Stores, Incorporated, hereinafter termed ''Lucky''] to do any of the following acts:
''(1) the selective hiring of negro clerks, such hiring to be based on the proportion of white and negro customers who patronize . . . [Lucky's] stores.''*

We have concluded that, upon the principles enunciated in *James* v. *Marinship Corp.* (1944), 25 Cal.2d 721, 745 [155 P.2d 329, 160 A.L.R. 900], and *Park & Tilford I. Corp.* v. *International etc. of Teamsters* (1946), 27 Cal.2d 599, 607,

---

*The injunction also restrained picketing for the purpose of compelling Lucky to discharge certain employes who had participated in the apprehension of a man accused of theft from one of Lucky's stores located in the city of Richmond. However, at the oral argument before this court counsel for the respective parties agreed that the issue concerning the discharge of such employes had been dropped from the case. We therefore treat the injunction as being directed solely against ''selective'' or ''proportional'' hiring.

614 [165 P.2d 891, 162 A.L.R. 1426], the injunction properly restrained picketing for the purpose described, and that the judgment of contempt should be affirmed.

The controlling issue is whether the sole objective involved—the discriminatory hiring of a fixed proportion of Negro employes regardless of all other considerations—is lawful. Relative to this issue it is to be particularly noted that here the only activity enjoined is "picketing . . . for the purpose of compelling . . . [Lucky] to . . . [engage in] the selective hiring of negro clerks . . . based on the proportion of white and negro customers who patronize . . . [Lucky's] stores." This is in contrast to the situation which was presented in *Park & Tilford I. Corp.* v. *International etc. of Teamsters* (1946), *supra,* 27 Cal.2d 599, wherein the injunction which had been issued broadly forbade "concerted activities" for any purpose. As stated in that case (p. 614 of 27 Cal.2d), "Since defendants, in connection with their concerted activities, made unlawful demands that plaintiff sign a closed shop contract and coerce its employees to join defendant unions, it was permissible for the trial court to enjoin defendants from making such demands," but (p. 607 of 27 Cal.2d), "The injunction . . . was not limited to enjoining such demands but prohibited defendant's concerted activities and thus prevented defendants from exercising their right under the law of this state and of the federal government to engage in such activities for a closed shop." It is also to be borne in mind that the proceeding before us is not an appeal from the order granting an injunction but is a petition for certiorari to annul a contempt adjudication.

Petitioners allege that on June 21, 1947, approximately three weeks after the injunction issued, they picketed in front of Lucky's Canal Store, "which store is located in the City of Richmond, County of Contra Costa, State of California, bearing placards which carried the following legend: 'LUCKY WONT HIRE NEGRO CLERKS IN PROPORTION TO NEGRO TRADE—DONT PATRONIZE' "; that on the same day they were served with a citation to appear before the superior court on June 23, 1947, and show cause why they should not be adjudged in contempt; that on June 23 they were found guilty of "contempt of the aforesaid preliminary injunction" and received sentence. Petitioners allege further that both on June 21, 1947, and prior to issuance of the injunction petitioners and the other defendants named in the injunction proceedings

"were picketing to secure a change of employment policy and working condition of LUCKY . . . by seeking to have LUCKY . . . hire at its Canal Store . . . a number of Negro clerks proportionate to the number of Negro customers of said Canal Store . . . A demand for these changes in employment policy was made by your petitioners upon LUCKY . . . before any picketing was done at the said Canal Store, which demand related to future vacancies and did not . . . contemplate the discharge of any of the present personnel of said Canal Store." Each petitioner alleges that he is a member and officer of one of the associations named as defendants in the injunction and that each of such associations has a "substantial number of Negroes as members, in the City of Richmond." It is also alleged that petitioners "individually, and as officers" of the associations "have an interest in promoting the employment by LUCKY . . . of Negro personnel and in improving the employment possibilities of Negro citizens, particularly of those Negro citizens who are members of the defendant organizations.

"D. The picketing conducted by your petitioners in their individual and representative capacities, and by the defendants . . . [named in the injunction] was designed to promote and foster the aforesaid interest in increasing the employment possibilities of Negro citizens.

"E. The City of Richmond, County of Contra Costa, State of California, has a large and growing Negro population in excess of ten thousand persons; unemployment among this Negro population is greatly disproportionate to the unemployment among the white persons in Richmond; traditionally, many industries and occupations are closed to Negroes and will remain closed until the Negro people can make effective their demand to obtain equality of opportunity for employment and to prevent economic discrimination against Negroes.

"F. The picketing . . . [at all times] was peaceful and orderly, without force or violence; the pickets did not prevent the customers and employees of LUCKY . . . in going to and from the said Canal Store; the picketing was unaccompanied by misrepresentation, threats or intimidation of any sort."

Petitioners urge that the preliminary injunction violated their constitutional right of free speech and was therefore in excess of the court's jurisdiction and void. If their position is sound, a judgment holding them guilty of contempt of the injunction will be annulled upon certiorari. (*Fortenbury* v.

*Superior Court* (1940), 16 Cal.2d 405, 407-409 [106 P.2d 411];
*Kreling* v. *Superior Court* (1941), 18 Cal.2d 884 [118 P.2d
470].)

After the alternative writ issued, respondent superior
court and Lucky, the real party in interest, joined in
filing an answer and return. They admit that the picket-
ing by petitioners was without force or violence, but
deny that it "was unaccompanied by misrepresentation."
They allege that Lucky's "policy throughout has been to hire
employees on their individual merit and capacity" and deny
that Lucky has discriminated against the Negro race; certain
affidavits in support of this allegation and denial are attached
to the answer and return.

Respondent and Lucky contend, among other points, that
the picketing here involved, and upon which the judgment
of contempt is based, was for the attainment of an unlawful
objective, viz.: not to induce Lucky not to discriminate against,
but, rather, expressly to compel Lucky to discriminate arbi-
trarily in favor of, one race as against all others in the hiring of
a portion of its clerks; and that therefore the injunction was
properly issued and the judgment of contempt should stand.
With this position, upon the record here, we must agree.

■ It is now established as the law that "the right to
picket peacefully and truthfully is one of organized labor's
lawful means of advertising its grievances to the public, and
as such is guaranteed by the Constitution as an incident of
freedom of speech." (*McKay* v. *Retail Auto. S. L. Union No.
1067* (1940), 16 Cal.2d 311, 319 [106 P.2d 373], and cases
there cited; see also *Magill Bros.* v. *Bldg. Service etc. Union*
(1942), 20 Cal.2d 506, 511-512 [127 P.2d 542]; *People* v.
*Dail* (1943), 22 Cal.2d 642, 651 [140 P.2d 828]; *In re Blaney*
(1947), 30 Cal.2d 643, 647 [184 P.2d 892].) ■ Nevertheless,
as emphasized in *James* v. *Marinship Corp.* (1944), *supra,* 25
Cal.2d 721, 728-729 (see also authorities there cited), the
state may protect against abuses of the right; "the object of
concerted labor activity must be proper and . . . must be
sought by lawful means, otherwise the persons injured by
such activity may obtain damages or injunctive relief." (See
also *Park & Tilford I. Corp.* v. *International etc. of Team-
sters* (1946), *supra,* 27 Cal.2d 599, 603; *Northwestern Pac.
R. R. Co.* v. *Lumber & S. W. Union* (1948), 31 Cal.2d 441,
446 [189 P.2d 277].)

In the Marinship case the court was concerned with the
"fundamental question . . . whether a closed union coupled

with a closed shop is a legitimate objective of organized labor." (P. 730 of 25 Cal.2d.) We held that a union which holds a closed shop contract or other form of labor monopoly must admit Negroes "to membership under the same terms and conditions applicable to non-Negroes unless the union and the employer refrain from enforcing the closed shop agreement against them." There was not in that case any contention that the *number of Negroes* admitted to membership in the union or hired by the employer must be proportional, regardless of all other considerations, to the number of Negroes residing in the area or doing business with the employer. The judgment awarding a preliminary injunction which "was clearly intended to do no more than eliminate discrimination upon the basis of race and color alone," was affirmed. (P. 745 of 25 Cal.2d; see also *Williams* v. *International etc. of Boilermakers* (1946), 27 Cal. 2d 586, 588-593 [165 P.2d 903]; *Thompson* v. *Moore Drydock Co.* (1946), 27 Cal.2d 595, 597-598 [165 P.2d 901].)

It is apparent that the same principles which impelled affirmance of the judgment in Marinship require that the injunction and the contempt order in the case now before us be upheld. The parties in their briefs argue as to whether Lucky does or does not discriminate against Negroes in its employment of clerks, as to whether that matter was considered or determined by the trial court, and as to whether the affidavits treating of that matter and attached to the answer and return are properly before this court. It may be assumed for the purposes of this decision, without deciding, that if such discrimination exists, picketing to protest it would not be for an unlawful objective. However, no such broad purpose is shown to have motivated the activities here and the judgment of contempt is not affected by such proposition. Petitioners themselves specifically allege that their activities were "to secure a change of employment policy and working condition of LUCKY . . . by seeking to have LUCKY . . . hire at its Canal Store . . . a number of Negro clerks proportionate to the number of Negro customers of said Canal Store . . ."; the injunction which petitioners violated was directed at and limited to the narrow issue of "selective hiring of Negro clerks . . . based on the proportion of white and Negro customers"; and the placards carried by petitioners in the course of such violation bore the words: "LUCKY WONT HIRE NEGRO CLERKS IN PROPORTION

TO NEGRO TRADE—DONT PATRONIZE.'' The fact that the hiring by Lucky of a small proportion of Negro employes might tend to show discrimination against Negroes is beside the point; likewise it is immaterial here that Lucky denied any such discrimination. The controlling points are that the injunction is limited to prohibiting picketing for a specific unlawful purpose and that the evidence justified the trial court in finding that such narrow prohibition was deliberately violated.

If Lucky had yielded to the demands of petitioners, its resultant hiring policy would have constituted, as to a proportion of its employes, the equivalent of both a closed shop and a closed union in favor of the Negro race. It would have had no choice but to employ only members of the Negro race in a fixed number of clerical positions, thus effectuating a closed Negro shop as to those positions. Moreover, because race and color are inherent qualities which no degree of striving or of other qualifications for a particular job could meet, those persons who are born with such qualities constitute, among themselves, a closed union which others cannot join. It was just such a situation—an arbitrary discrimination upon the basis of race and color alone, rather than a choice based solely upon individual qualification for the work to be done —which we condemned in the Marinship case, *supra* (25 Cal. 2d 721, 737, 745). The fact that those seeking such discrimination do not demand that it be practiced as to all employes of a particular employer diminishes in no respect the unlawfulness of their purpose; they would, to the extent of the fixed proportion, make the right to work for Lucky dependent not on fitness for the work nor on an equal right of all, regardless of race, to compete in an open market, but, rather, on membership in a particular race. If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis. Yet that is precisely the type of discrimination to which petitioners avowedly object.

There has been some suggestion that the case of *New Negro Alliance* v. *Sanitary Grocery Co.* (1937), 303 U.S. 552 [58 S.Ct. 703, 82 L.Ed. 1012], is in some way in point in this litigation, and isolated excerpts of the language in that opinion have been quoted to us. But there is no serious contention that the Norris-LaGuardia Act (Act of March 23, 1932, ch. 90, 47 Stats. 70, 73, 29 U.S.C. §§ 101-115) operates in this case to divest the state courts of jurisdiction in the premises and, in the

New Negro Alliance case, the only "matter in controversy," as expressed by the court, was (p. 554 of 303 U.S.) "whether the case made by the pleadings involves or grows out of a labor dispute within the meaning of section 13 of the Norris-LaGuardia Act" and, consequently, whether the United States District Court, by sections 4 and 7 of the act, was deprived of jurisdiction to issue an order in the premises. The question involved in the cited case is not one which we reach, and as that case contains neither a discussion of any of the considerations which impel our decision nor of any controlling constitutional principle, it provides no precedent of value in resolving any issue now before us.

Petitioners assert that in *Park & Tilford I. Corp.* v. *International etc. of Teamsters* (1946), *supra,* 27 Cal.2d 599, 607, we "held that peaceful picketing could not be enjoined regardless of the object of such picketing." No such sweeping license was announced in that case. The judgment there enjoined defendants from, among other activities, "any and all picketing or boycotting of plaintiff or of plaintiff's business, products or merchandise." (P. 603 of 27 Cal.2d.) We held, as previously shown, that at least one of the purposes of defendants in picketing was unlawful and that the judgment should be modified by limiting the injunction to the enjoining of defendants from continuing their activities in connection with that purpose; defendants' activities in connection with lawful demands and purposes were freed from the injunction. By contrast, the injunction in the case now before us is limited to enjoining picketing for a specifically designated unlawful purpose, viz.: discrimination in favor of persons of the Negro race, based on race alone, and hence, arbitrary. Such injunction appears to have been properly issued, and the judgment of contempt based thereon will be affirmed.

Lucky contends, further, that the picketing here in issue was not "a lawful exercise of the right" and not within the constitutional guarantee of free speech, because the defendants had "no relation to the labor contract," the picketing was not directed at working conditions, and the dispute "is solely racial." Lucky also urges that acceding to petitioners' demands for proportional hiring would necessarily result in breach of its collective bargaining contract with the Retail Clerks Union. However, by reason of the conclusion we have reached as to the unlawfulness of petitioners' objective

in their activities, and in view of the narrow limit of the injunction which issued and was violated, we do not reach these or other contentions of the parties.

The judgment of contempt is affirmed.

Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

As the majority make no attempt to state the facts with particularity, it seems advisable to do so here. The controversy centered around a grocery store in Richmond, Contra Costa County, one of a chain operated by Lucky Stores, Incorporated. Petitioners were adjudged guilty of contempt in that, in violation of the terms of a preliminary injunction, they admittedly continued to picket the store in question. They seek by this proceeding in certiorari to have the adjudication of contempt annulled, charging that their constitutional rights have been violated. This court has held that certiorari is the appropriate method to test the jurisdiction of the superior court where it is challenged on constitutional grounds. (*Fortenbury* v. *Superior Court,* 16 Cal.2d 405 [106 P.2d 411] ; *Kreling* v. *Superior Court,* 18 Cal.2d 884 [118 P.2d 470].)

Lucky Stores sought an injunction in the Superior Court of Contra Costa County, naming petitioners and various organizations and individuals as defendants. In its verified complaint it alleged that it was a party to a collective bargaining contract with a certain clerks' union wherein it had agreed to employ only members of the union unless the union could not meet its demands, or unless the unemployed members of the union were not satisfactory to it, in which event it might employ nonunion members, but that such nonunion employees must then join the union within a specified time. It was further alleged that these petitioners and other defendants demanded that Lucky Stores agree to hire Negro clerks in such proportion as the Negro customers bore to the white customers who patronized the store, and that plaintiff (Lucky Stores) discharge those employees who had participated in the apprehension and arrest of one Jackson who had been accused of shoplifting. Lucky Stores alleged that these demands were refused because to comply with them would violate the contract existing between it and the union, and that no labor dispute exists between it and the union, and

that as a result of its refusal to comply, the petitioners and other defendants have picketed its store. It is contended that this picketing will cause irreparable injury, that it is an infringement on plaintiff's right to do business, and would require it to violate its contract with the union.

In response to the order to show cause why a preliminary injunction should not issue, petitioner Hughes filed a counter-affidavit in the injunction proceeding in which he sets forth the following facts: That he is a member and an officer in several of the organizations sought to be enjoined, and that he makes the affidavit in both his personal and representative capacities; that he and the other petitioner, Richardson, met with some officials of Lucky Stores and protested the treatment accorded Jackson; that he requested Lucky Stores, so far as this particular store is concerned, to hire gradually Negro clerks until the proportion of Negro to white clerks approximated the proportion of Negro to white customers. This proportional hiring was to take place as the white clerks left the employ of the store in question, or were transferred by plaintiff to other stores owned and operated by it. It was specifically stated that petitioner did not request the discharge of any employees of the store, but only that vacancies be filled with Negroes until the approximate proportion was reached. It was further alleged that about 50 per cent of the customers at this particular store were Negroes. At this time, petitioner had no knowledge of the contract existing between Lucky Stores and the union, but that subsequently the officials of the union informed petitioner that the union accepted Negro members, and that it had such qualified members presently unemployed, and could supply Negro clerks to any employer requesting such help. Petitioner states further that on May 19, 1947, members of several of the organizations sought to be enjoined, picketed the store in question. This picketing was confined to not more than six pickets patrolling an area more than 100 feet wide; that the pickets were peaceful and there was no violence, no comments were made to customers or employees, other than the placards which were carried by the pickets. The words on the placards were to the effect that Lucky Stores refused to hire, at this particular store, a proportionate number of Negro clerks.

The affidavit of Richardson, the other petitioner, was to the same effect, and contained substantially the same state-

ments. Neither of these affidavits was controverted by the plaintiff in the trial court.

The trial court granted a preliminary injunction in favor of the plaintiff. Petitioners violated the terms of the injunction by picketing the store in question and were adjudged guilty of contempt of court.

It was agreed, at the oral argument before this court, by counsel for the respective parties, that the issue concerning Jackson had been dropped from the case. The sole question involved, at the present time, therefore, is the right of petitioners to picket a retail store, thereby setting forth their grievances and demands and publicizing the same.

When the writ of certiorari issued, respondent superior court and Lucky Stores, as real party in interest, joined in filing an answer and return, alleging that the picketing was without force and violence, but denying that it was not accompanied by misrepresentation, and alleging that the policy of Lucky Stores was to hire its employees on their individual merit and capacity, and denying that there had been any racial discrimination. It was contended that the picketing here involved was for the attainment of an unlawful objective.

It is a well-established principle that the Fourteenth Amendment to the federal Constitution invalidates legislation that infringes substantive rights of a fundamental character. The decision of the Supreme Court of the United States in *Cantwell* v. *Connecticut*, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed 1213, 128 A.L.R. 1352], made it clear that a judicial decision in the field of substantive law might also be found to be a violation of due process. *Bridges* v. *State of California*, 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed 192], was the first case to decide that punishment for contempt may violate the guaranty of freedom of speech.

The United States Supreme Court has held that picketing is identified with the freedom of speech guaranteed by the First Amendment to the Constitution of the United States. (*Bakery Drivers' Local* v. *Wohl*, 315 U.S. 769 [62 S.Ct. 816, 86 L.Ed. 1178]; *Milk Wagon Drivers' Union, Local 753* v. *Meadowmoor Dairies*, 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200]; *Thornhill* v. *Alabama*, 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; *Carlson* v. *California*, 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed 1104].) This court has also so held in *In re Blaney*, 30 Cal.2d 643 [184 P.2d 892], *Northwestern Pac. Railway Co.* v. *Lumber & Saw Mill*

*Workers' Union,* 31 Cal.2d 441 [189 P.2d 277] ; *Park & T. I. Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599 [165 P.2d 891, 162 A.L.R. 1426] ; *McKay* v. *Retail Auto S. L. Union No. 1067,* 16 Cal.2d 311 [106 P.2d 373] ; *Magill Bros.* v. *Bldg. Service etc. Union,* 20 Cal.2d 506 [127 P.2d 542], and others. In so holding, this court has established as the law of this state that the right to picket peacefully and truthfully is one of labor's lawful means of advertising its grievances to the public.

It is quite true that the basic reason advanced in support of the fundamental right of freedom of speech for a free people grew out of the need to speak freely concerning political matters, but it is equally true that there is a need to speak freely with reference to economic matters. This may require a rather delicate balancing of interests involved, in that labor's right to speak freely with regard to its grievances may, in some respects, infringe on the employer's right to conduct his business as he chooses. Labor, always in a less advantageous bargaining position, has been held privileged to picket in an endeavor to put before the public its position, needs, and desires.

It is conceded here that picketing is free speech and something more. It is not an absolute right, but may be said to be in a category by itself, and as such subject to *reasonable* regulation by the courts. The boundaries circumscribing the right to picket are said to be that the *object* of concerted labor activity must be proper and that it must be sought by lawful *means,* or the persons injured by such activity may obtain damages or injunctive relief. There is no dispute here concerning the means used since the picketing was admittedly peaceful. The dispute centers around the objective sought by petitioners.

The picket seeks, through economic pressure, to induce certain action on the part of another. The activity sought to be induced may be one or more of many things. He may be one of a number of employees seeking better hours, working conditions, better pay for his labor, or he may, as in the present case, seek employment for himself and members of his race. It was held by this court in *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389 [106 P.2d 414], and in the McKay case, *supra,* that labor may exert economic pressure upon employers provided that peaceful means are used and the

purpose is one reasonably related to labor conditions. Despite the picketing the public might choose to patronize the merchant, but labor must be given some opportunity to put its case before the public, that the public may decide for itself whether or not the worker's position is a just one.

In *New Negro Alliance* v. *Sanitary Grocery Co.,* 303 U.S. 552 [58 S.Ct. 703, 82 L.Ed 1012], it was held that petitioners, members of a group organized to obtain advancement for the benefit of colored persons, were parties to a "labor dispute" within the meaning of the Norris-LaGuardia Act. The facts were substantially the same as are presented here, except for the words on the placards which the Negroes carried. The court stated the case, on page 559, in the following language: "The case, then, as it stood for judgment, was this: The petitioners requested the respondent to adopt a policy of employing negro clerks in certain of its stores in the *course of personnel changes*: the respondent ignored the request and the petitioners caused one person to patrol in front of one of respondent's stores on one day carrying a placard which said: 'Do Your Part! Buy Where You Can Work! No Negroes Employed Here!' . . ." and said on page 561, "The Act does not concern itself with the background or the motives of the dispute. The desire for fair and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association. Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation . . ." [Emphasis added.]

The public policy of this state, as declared by the courts, is in exact accord with the statutory policy of the Norris-LaGuardia Act as interpreted in the above case. It has been here determined that picketing is justified even though no dispute exists between employer and employees. (*McKay* v. *Retail Auto. S. L. Union, supra.*) The Smith case, *supra,* pointed out that the term "labor dispute" is a broad one, and in the absence of statutory definition, may be properly applied to any controversy which is reasonably related to employment and to the purposes of collective bargaining. (*Park & T. I. Corp.* v. *International etc. of Teamsters, supra.*)

It is said that petitioners' objective is unlawful for several reasons: (1) That if the demand of the petitioners had been complied with the result would have been, in effect, the equivalent of both a closed shop and a closed union in favor of the Negro race; and (2) that such a result would have resulted in discrimination in favor of the Negro race; and (3) that petitioners' objective was not a lawful exercise of the right to picket and hence not within the constitutional guaranty of free speech because petitioners had no relation to the labor contract; that the picketing was not directed at working conditions, but a racial dispute, and that a compliance with the demand would result in a breach of the contract between Lucky Stores and the Retail Clerks' Union. The majority thought it unnecessary to discuss the latter point inasmuch as they found petitioners' objective otherwise unlawful.

The majority, in holding that the judgment of contempt should be affirmed, state that the case of *James* v. *Marinship Corp.*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], is controlling. The facts in the Marinship case are as follows: Marinship, as employer, had a closed shop agreement with a labor union, whereby it agreed to hire only members of a particular union. Plaintiff, a member of the Negro race, was not admitted to full membership in the union, nor were other members of his race, but he, and they, were admitted to separate Negro lodges affiliated with the union. Negroes were forced to pay dues to these lodges in order to obtain work clearances for employment at Marinship. Marinship was under contract with the federal government wherein it was provided that it would not discriminate against any worker because of race, color, creed or national origin. Plaintiffs were willing to become members of the union on equal terms with other members, but the union would not receive them on that basis. These, then, are the facts which led to the basic question there involved: Whether a closed union coupled with a closed shop is a legitimate objective of organized labor. This question was answered in the negative. It was held that the union may not maintain *both* a closed shop and an arbitrarily closed union.

A closed shop is defined as one that employs *only* union members. (*Irving* v. *Joint Dist. Council, U. B. of Carpenters* (N.Y.), 180 F. 896, 899; *Miners in General Group* v. *Hix*, 123 W.Va. 637 [17 S.E.2d 810, 813].) A closed union is one

864

which arbitrarily denies admittance to qualified workers. It was the combination of the two, resulting in discrimination between the races, which brought about the end result—that the discriminated-against race was unable to obtain gainful employment in the closed shop, admittedly a vicious circle, which was forbidden by the decision in the Marinship case. This is the case, which, according to the majority, is supposedly analogous to the result sought to be achieved by petitioners here.

The Retail Clerks' Union, which is involved here only incidentally, is not a closed union. It numbers among its members those of both the white and Negro races. It has also among its members, unemployed qualified Negro clerks. The contract between Lucky Stores and this union was not a "closed shop" agreement, but in reality, a "union shop" agreement. (*Markham & Callow, Inc.* v. *International Woodworkers*, 170 Ore. 517 [135 P.2d 727]; *Miners in General Group* v. *Hix*, 123 W.Va. 637 [17 S.E.2d 810].) Lucky Stores agreed to hire union members, or if they could not be supplied, it might hire others, who must then become members of the particular union. Thus far, we have the normal situation involving a union and an employer. But the present case involves a triparty situation, which the majority insist on considering as the usual one involving a union and an employer. Petitioners are asking that Negro clerks be hired, and they are quite willing, and would consider their demands fully met if the unemployed qualified Negro clerks, presently members of the union involved were hired. The statement in the majority opinion that the right to work for Lucky Stores would be based on race, rather than qualification for the work, is absolutely without foundation. Nothing could be more remote from the truth.

It is true that one must be born into the Negro race in order to qualify for membership within its ranks, but that is also quite true of the Caucasian, Chinese and Japanese races. But the majority have forgotten that the State of California is one of the United States of America where "all men are created equal," where all have equal rights, and where it has been repeatedly declared that discrimination shall *not* exist because of race, color or creed.

The situation presented here does not fall within the rule announced in the Marinship case. It does not fall within the definitions of either a closed shop, or a closed union. It must be remembered that picketing for *either* a closed shop,

*or* a closed union is not forbidden by law, but that the combination of the two is considered unlawful. It may be assumed for this purpose, that petitioners are asking that a certain proportion of their race be employed in this particular store and that the "shop" would then be closed as to a certain number of employees, although it is difficult to perceive how "closed" and "*half* closed" may be defined as meaning the *same* thing. Petitioners are not asking that the union admit only Negro members, nor are they asking that it admit any Negro members. The Retail Clerks' Union which is involved is an open one. This point is ignored, and the majority assume that petitioners are members of the Negro "union," that, of necessity, it is a closed "union," and for Lucky Stores to meet petitioners' demand would result in a closed shop and a closed union, an unlawful result. As a necessary analogy then, we have every shop employing only white help operating a "closed" shop with the aid of a "closed union," since only white persons may belong to the white "union," and we have, as a result, many flagrant violations of the Marinship rule. This absurd situation follows from considering that a *race* of people constitute a "union."

The majority opinion states "If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis." Petitioners are seeking nondiscrimination, not discrimination. Discrimination is treatment which is not equal. It follows that nondiscrimination must be equal treatment. Petitioners are seeking just that, and nothing more. It has long been established in equity, that the court will look through form to substance. It has also been said often and emphatically that in equity each case must be decided on its own facts, hence it might logically follow that in a neighborhood predominantly Chinese or Japanese, or on an Indian reservation that picketing for a proportional hiring of members of the particular race involved would be just, equitable and entirely in accord with sound public policy. It is not involved here. But involved here is a store situated in a district where the population is composed of a large majority of members of the Negro race. These members of the Negro race comprise at least 50 per cent of the customers of the store in question. The petitioners by means of peaceful picketing and through the words printed on their

placards were seeking to publicize their grievance to members of their race, and to members of the white race in sympathy with their long struggle for freedom, so that economic pressure might be exerted to gain for them equality in the labor field. They requested only that a proportionate number of Negro clerks be hired as replacements were necessary. Not that any white person be fired that they might be hired.

It must be admitted by every thinking person that Negroes are, and have been, constantly discriminated against. They are considered by some people as being fit for only the most menial positions. It was even found necessary for the Legislatures of the various states to pass laws that they might obtain shelter and food on an equal basis with members of the white race. The abolition of slavery did not free the Negro from the chains his color imposes on him. It has been said that Negroes may obtain equal opportunities with others for employment by organization, public meetings, propaganda, and by personal solicitation. The effectiveness of these methods may well be doubted. Labor, as a whole, found that the only way it might attain its objectives of better working conditions, hours and pay was to exert economic pressure on employers. Nothing else was heeded. Is the Negro here to be denied his only effective means of communicating to the public the facts in connection with the discrimination against him, and the only effective method by which he may achieve nondiscrimination?

The majority assume, without deciding, that if racial discrimination exists, picketing in protest of it would not be for an unlawful objective. How can it be said that picketing to attain nondiscrimination is unlawful? Petitioners are asking *equal* treatment, that which is guaranteed to them by the Constitution of the United States, and yet their objective is called "unlawful."

The end result of the majority decision is to establish a rule which may be applied to prevent picketing for the purpose of publicizing the fact that an employer is discriminating against persons because of race or color in the selection of his employees. Because, if such employer should employ only one of such race or color in some menial position, such as janitor or messenger boy, any claim of discrimination, according to the majority view, would be unjustified, and picketing to prevent discrimination (even though thousands of qualified members of such race or color were refused employment for that reason) would be unlawful, and could be

restrained by injunction. This must be the effect of the rule announced in the majority opinion. For if an employer who employs only one or two of a certain race in 10,000 employees, when hundreds of qualified members of such race are seeking employment, and he can be picketed by the members of such race to induce the employment of an increased number of such members, then, it must follow that such employer may be picketed for the purpose of inducing him to employ a sufficient number of members of such race to indicate an intention not to discriminate against the members of such race in the selection of his employees. In other words, if the picketing is truthful and peaceful, it may be resorted to as the exercise of the constitutional right of freedom of speech or press, and that is all petitioners did in this case.

It is my opinion, therefore, that the writ should issue annulling the judgment of contempt rendered against the petitioners.

TRAYNOR, J.—I dissent.

In my opinion this case was correctly decided by the District Court of Appeal and the judgment of contempt should be annulled for the reasons set forth in the opinion of that court by Presiding Justice Peters. (82 A.C.A. 491, 186 P.2d 756.) It is here necessary to direct attention only to those considerations that compel me to take issue with the majority opinion of this court.

That opinion holds that the object of the picketing was to limit certain jobs to a closed shop and a closed union and that such an object is unlawful by virtue of *James* v. *Marinship Corp.*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]. In my opinion this holding is based on an erroneous application of that case. The union there had secured through its closed shop contract a monopoly of the jobs in a certain plant, and this court held that a union with such a monopoly cannot close its doors on racial grounds and simultaneously enforce its closed shop contract against those arbitrarily excluded from the union. In the present case petitioners seek, not a monopoly of the jobs available, but only a share of those jobs that they believe they would have had if there had been no discrimination against them. The union in the Marinship case was free to open its ranks to all. Here a group helpless to open its ranks to all is seeking a share of the available jobs in proportion to its patronage. Rules developed to curb abuses

of those already in control of the labor market have no application to situations where the moving party is seeking to gain a foothold in the struggle for economic equality. Petitioners are seeking by reasonable methods to discourage discrimination against them. It is unrealistic to compare them with those who sought to couple a closed union with a closed shop for the very purpose of discrimination.

Those racial groups against whom discrimination is practiced may seek economic equality either by demanding that hiring be done without reference to race or color, or by demanding a certain number of jobs for members of their group. The majority opinion holds that economic equality cannot be sought by the second method if picketing is adopted as the means of attaining that objective. In the absence of a statute protecting them from discrimination it is not unreasonable for Negroes to seek economic equality by asking those in sympathy with their aims to help them secure jobs that may be opened to them by the enlistment of such aid. In their struggle for equality the only effective economic weapon Negroes have is the purchasing power they are able to mobilize to induce employers to open jobs to them. (See *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U.S. 552, 561 [58 S.Ct. 703, 82 L.Ed. 1012] ; *Bakery Drivers' Local* v. *Wohl*, 315 U.S. 769, 775 [62 S.Ct. 816, 86 L.Ed. 1178].) There are so few neighborhoods where Negroes can make effective appeals against discrimination that they may reasonably regard the seeking of jobs in neighborhoods where their appeal may be effective the only practical means of combating discrimination against them. In arbitrating the conflicting interests of different groups in society courts should not impose ideal standards on one side when they are powerless to impose similar standards upon the other. Only a clear danger to the community would justify judicial rules that restrict the peaceful mobilization of a group's economic power to secure economic equality. (See Mr. Justice Brandeis dissenting in *Duplex P. P. Co.* v. *Deering*, 254 U.S. 443, 488 [41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196] ; *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389, 403 [106 P.2d 414].) There is no reality in the reasoning that those who seek to secure jobs where they have an opportunity to enlist public support on their behalf are thereby seeking illegal discrimination in their favor, for the fact remains that everywhere they turn for jobs they are likely to encounter the barrier of discrimination.

The picketing in this case is directed at persuading Lucky to take action that it may lawfully take on its own initiative. No law prohibits Lucky from discriminating in favor of or against Negroes. It may legally adopt a policy of proportionate hiring. The picketing confronts Lucky with the choice of adopting a policy that is not illegal in itself or risking the loss of patronage that may result from the picketing. Had California adopted a fair employment practices act that prohibited consideration of the race of applicants for jobs, it might be said that the demand for proportional hiring would be a demand that Lucky violate the law. Neither the Legislature nor the people have adopted such a statute, and I find no implication in the majority opinion that its equivalent exists under the common law of this state.

It is important to note, apart from the lawfulness of the objective, that the picketing in this case has none of the nonspeech characteristics that would justify an injunction. It is established by numerous United States Supreme Court decisions that picketing is protected as an exercise of free speech. (*Cafeteria Emp. Union, Local 302* v. *Angelos,* 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58] ; *Bakery Drivers' Local* v. *Wohl,* 315. U.S. 769 [62 S.Ct. 816, 86 L.Ed. 1178] ; *Carpenters' Union* v. *Ritter's Cafe,* 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143] ; *A. F. of L.* v. *Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed 855] ; *Milk Wagon Drivers' Union* v. *Meadowmoor Dairies,* 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200] ; *Carlson* v. *California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104] ; *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093] ; *Senn* v. *Tile Layers' Union,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229].) As such the states must deal with it as a protected right under the First and Fourteenth Amendments to the United States Constitution. Within the free speech guaranty, traditional modes of communication are protected unless a clear and present danger of serious substantive evil is shown. (*Thomas* v. *Collins,* 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430] ; *Bridges* v. *California,* 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192].) Although picketing has not been so identified with other forms of speech that its permissible limits are governed by the same tests (*Carpenters' Union* v. *Ritter's Cafe, supra,* 315 U.S. 722; *Milk Wagon Drivers' Union* v. *Meadowmoor Dairies,* 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200] ), a state may not deny it protection as free speech when the elements that·

differentiate it from other forms of speech are not present. (See Armstrong, *Where Are We Going With Picketing*, 36 Cal.L.Rev. 1, 30-40).

In recognition of the fact that picketing often entails more than speech, the United States Supreme Court has allowed states to place limitations on picketing as they could not on traditional modes of communication. In these decisions the Supreme Court has been concerned in the main with the evils attending certain forms of picketing. Thus violent or untruthful picketing is not protected. (*Milk Wagon Drivers' Union* v. *Meadowmoor Dairies, supra,* 312 U.S. 287; see *Cafeteria Emp. Union, Local 302* v. *Angelos, supra,* 320 U.S. 293, 295; *Magill Bros.* v. *Building Service etc. Union,* 20 Cal.2d 506 [127 P.2d 542].) Again, special circumstances may justify a state's limiting the places where and the persons against whom picketing may be carried on. (*Carpenters' Union* v. *Ritter's Cafe, supra,* 315 U.S. 722.) A state may declare, for instance, that the conscription of neutrals, dissociated from the dispute involved, may not be enforced by picketing those neutrals. (*Carpenters' Union* v. *Ritter's Cafe, supra,* 315 U.S. 722, 728.) Since picketing is a form of protected free speech, some greater evil or more imminent danger must be found to justify its suppression than would be required to justify curtailment of action protected only by the due process clause independent of the First Amendment. (See *Board of Education* v. *Barnette,* 319 U.S. 624, 639 [63 S.Ct. 1178, 87 L.Ed 1628, 147 A.L.R. 674].)

A forceful advocate of the view that picketing is not free speech has discussed the nature of picketing as follows: "Picketing is the marching to and fro before given premises with a banner usually containing assertions that the picketed person is 'unfair to organized labor,' or that his employees are on 'strike.' Sometimes the picket speaks these very same words or adds further assertions. This, substantially, is labor's method of stating its side of the controversy. Rarely, if ever, does labor inform the public of all the differences which exist between it and the employer. Nor, indeed, can labor be expected to do so since few will stop to read or listen. Thus the picket appeals basically to sympathy; sometimes, however, he appeals to the customer's sense of embarrassment. Often, too, the picket depends upon the observance by union members of the rule—either formally embodied or tacitly understood—forbidding the crossing of picket lines. Another purpose of

the picket is to inform those delivering goods to or taking goods from, the picketed establishment that it is on the union's unfair list. In the *Ritter's Cafe* case the cafe employees had no quarrel with Ritter over the terms and conditions of their own employment; they refused, nevertheless, to cross the picket line established by the carpenters' and painters' unions, and furthermore, truckmen refused to make deliveries necessary to Ritter's business.'' (Teller, *Picketing and Free Speech,* 56 Harv.L.Rev. 180, 201.) Virtually none of the nonspeech elements of picketing here described are present in this case.

If picketing does not contain substantial nonspeech elements and is primarily conducted to disseminate information, limitations that differentiate picketing from other forms of speech should not be invoked. The picketing here is of this type. The facts of the dispute were fully presented by the banners. Since the picketing was not being carried on by a labor union, no generally observed rules of labor unions against crossing picket lines were brought into play and no deliveries were interfered with. All that was involved in this case was an orderly appeal to the public coupled with a clear and truthful statement of the facts of the dispute. (See *New Negro Alliance* v. *Sanitary Grocery Co., supra,* 303 U.S. 552.) Under such circumstances the unlawful objective doctrine may not be invoked to differentiate picketing from traditional modes of communication. To do so unreasonably interferes with petitioners' right to publicize the facts of their dispute. (See *James* v. *Marinship Corp., supra,* 25 Cal.2d 721, 730; *A. F. of L.* v. *Swing, supra,* 312 U.S. 321, 325.)

Petitioner's application for a rehearing was denied November 29, 1948. Carter, J., and Traynor, J., voted for a rehearing.